UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRENT ALLEN ELISENS,

                          Plaintiff,

                                                          5:19-CV-1236
v.                                                        (MAD/TWD)

CAYUGA COUNTY MENTAL HEALTH, AUBURN
COMMUNITY HOSPITAL, DR. MICHAEL PRATTS,
COLLEEN CURR, FAITH EMERSON, DR. AHMAD BILAL,

                          Defendants.
_____

APPEARANCES:

BRENT ALLEN ELISENS
  Plaintiff, *pro se*
4943 Rockefeller Road
Auburn, New York 13201

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### <u>ORDER AND REPORT-RECOMMENDATION</u>

*Pro se* Plaintiff Brent Allen Elisens ("Plaintiff") filed an action against Cayuga County

Mental Health ("CCMH"), Auburn Community Hospital ("ACH"), Dr. Michael Pratts ("Dr.

Pratts"), Colleen Curr ("Curr"), Faith Emerson ("Emerson"), and Dr. Ahmad Bilal ("Dr. Bilal")

(collectively "Defendants") alleging Defendants violated his rights and committed medical

malpractice for committing him involuntarily pursuant to New York's Mental Health and

Hygiene Law.  (Dkt. No. 1.)  Currently before the Court is Plaintiff's application to proceed *in

forma pauperis* ("IFP Application") (Dkt. No. 2), and his motion to appoint counsel (Dkt. No. 3).

As noted herein, the Court grants Plaintiff's IFP Application necessitating the Court's review of

whether the complaint meets 28 U.S.C. § 1915(e)'s sufficiency standards.  As discussed below,

the Court recommends Plaintiff's complaint be dismissed in part but Defendants should answer most of Plaintiff's claims. Moreover, the Court denies Plaintiff's request for counsel with leave to renew.

## I.     PLAINTIFF'S IFP APPLICATION

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). Though Plaintiff's IFP Application is sparse on detail, the Court finds he has sufficiently described his financial condition to meet this standard. Therefore, Plaintiff's IFP Application (Dkt. No. 2) is granted.

## II.    SUFFICIENCY OF THE COMPLAINT

### A.     Standard of Review

28 U.S.C. § 1915(e) directs that when a person proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted . . . ." 28 U.S.C. § 1915(e)(2)(B)(ii). To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a

court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

However, this "does not exempt a [*pro se* litigant] from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983). Moreover, a court should not dismiss a *pro se* complaint "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

### B.      Summary of the Complaint

According to Plaintiff, on or about Friday, September 6, 2019, he attempted to file a grievance against Curr who works at CCMH for refusing to have a student leave the room during an appointment. (Dkt. No. 1 at ¶ 7.) Emerson thereafter instructed Plaintiff to return the following Monday. (*Id*. at ¶ 8.) When Plaintiff returned the next Monday, he met with Dr. Pratts who asked him about whether he had been admitted to inpatient care before. (*Id*. at ¶ 9.) Plaintiff confirmed he had and then left shortly thereafter. (*Id*.) Later that day, a New York State Trooper picked up Plaintiff for involuntary commitment to the psychiatric unit at ACH with a diagnosis of schizophrenia and delusional disorder. (*Id*. at ¶ 10.)

Plaintiff alleges a doctor did not see him the first day he was admitted to ACH but that Dr. Bilal evaluated him the following day. (*Id*. at ¶ 11.) Plaintiff asserts he recorded his conversation with Dr. Bilal wherein he makes fun of Plaintiff and said he would stay in the

hospital for weeks.  (*Id*. at ¶ 12.)  Plaintiff further alleges Dr. Bilal talked to him in a public

hallway.  (*Id*.)  Furthermore, he contends Dr. Bilal changed his medications and gave him

Risperidone to treat schizophrenia.  (*Id*. at ¶ 15.)

According to Plaintiff, he provided multiple forms of proof indicating he was in control

of himself and was not delusional, homicidal or suicidal.  (*Id*. at ¶ 13.)  He asserts Dr. Bilal and

Curr ignored these proofs.  (*Id*.)  Plaintiff further alleges he requested a court hearing, but one

was never scheduled because he was released a week later.  (*Id*. at ¶ 14.)  Plaintiff asserts he did

not meet the criteria for involuntary commitment under New York State Mental Health and

Hygiene Law and Defendants' acts violated the applicable standards of care.  (*Id*. at ¶¶ 18-19.)

Furthermore, Plaintiff asserts he has received multiple denials from his health insurance

company regarding his involuntary stay.  (*Id*. at ¶ 16.)  Thus, presumably, Plaintiff will be

primarily responsible for the cost of his involuntary hospital stay.  (*Id*. at ¶ 17.)

As a result of these allegations, Plaintiff asserts three numbered claims against

Defendants.  First, for "Negligence – Medical Malpractice."  Specifically, he asserts Defendants

breached the applicable standard of medical care owed to him which caused him injury.  (*Id*. at

¶¶ 20-21.)  His second count is for "Fraud – Medical Malpractice."  In this claim, he asserts

Defendants essentially lied about his mental state so they could admit him to care to obtain

insurance proceeds.  (*Id*. at ¶¶ 22-23.)  Finally, Plaintiff asserts a "HIPAA[1] VIOLATION OF

SOME SORT."  Plaintiff does not elaborate as to the basis for this claim.  (*Id*. at ¶¶ 24-26.)

In addition to these stated claims, the Court, granting special solicitude to Plaintiff, reads

two 42 U.S.C. § 1983 ("Section 1983") claims into his complaint for an illegal seizure and a

---

[1]  As discussed further below, the Court assumes Plaintiff is referring to the Health Insurance
Portability and Accountability Act of 1996 (hereinafter "HIPAA").

denial of his due process rights related to his involuntary—and allegedly inappropriate—confinement against Dr. Bilal in his individual and official capacity.

### C.     42 U.S.C. § 1983 Claims

Section 1983 provides "[e]very person who, under color of any [state] statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983. "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted).  "A plaintiff pressing a claim of violation of [her] constitutional rights under § 1983 is thus required to show state action." *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003).

"The Fourth Amendment requires that an involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing standard." *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) (citation omitted).  Moreover, because "[a]n involuntary civil commitment is a massive curtailment of liberty," the Due Process Clause also requires that a person not be involuntarily hospitalized if she is "not a danger either to herself or to others." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995).

At this early stage, the Court liberally construes Plaintiff's complaint to successfully allege constitutional violations with respect to his involuntary confinement against Dr. Bilal.[2] The Court expresses no opinion on the merits of Plaintiff's claims, including, but not limited to, whether the complaint could survive a motion to dismiss or for summary judgment.

### D.    Medical Malpractice Claims

Plaintiff raises two claims under the heading of medical malpractice, one based on "negligence" and the other on "fraud."  The Court construes these claims to raise New York law claims for medical malpractice and common-law fraud.

#### 1.    Malpractice

Under New York law "[t]he requisite elements of proof in a medical malpractice case are (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage."  *Amsler v. Verrilli*, 119 A.D.2d 786, 501 N.Y.S.2d 411, 411 (2d Dep't 1986).  As the Second Circuit has noted of New York malpractice law, "[i]n order to show that the defendant has not exercised ordinary and reasonable care, the plaintiff ordinarily must show what the accepted standards of practice were and that the defendant deviated from those standards or failed to apply whatever superior knowledge he had for the plaintiff's benefit." *Sitts v. United States*, 811 F.2d 736, 739–40 (2d Cir. 1987) (citing *Toth v. Community Hospital at Glen Cove*, 22 N.Y.2d 255, 292 N.Y.S.2d 440, 239 N.E.2d 368, 372 (1968).

Here, liberally construed, Plaintiff alleges Dr. Bilal and Curr engaged in medical malpractice because their conduct, if proved, substantially departed from accepted judgment,

---

[2]  It appears, based on the Complaint, Dr. Bilal is the person primarily responsible for Plaintiff's commitment.  Thus, the Court construes these claims to be against Dr. Bilal only.  Notably, if any of the other defendants were personally involved in the constitutional deprivation, Plaintiff should amend his complaint accordingly to assert such facts.

practices and standards. Among other things, they allegedly ignored proofs of his sanity and treated him for a condition (schizophrenia) for which he was not diagnosed. Therefore, at this early stage, the Court recommends his medical malpractice claim against these medical professionals (and the hospitals were Plaintiff was admitted, *i.e.*, ACH) survive initial review.

However, Plaintiff has failed to allege any allegations relative to Dr. Pratts and Emerson regarding his involuntary confinement. Thus, the Court recommends dismissing Plaintiff's claim of medical malpractice as against these two defendants with leave to replead.

### 2. *Common-Law Fraud*

The general requirements of a common-law fraud claim under New York law are "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006) (citation omitted).

However, a plaintiff's ability to assert a fraud claim in conjunction with a medical-malpractice claim, where the same events give rise to both causes of action, is limited.

> [W]ithout more, concealment by a physician or failure to disclose his own malpractice does not give rise to a cause of action in fraud or deceit separate and different from the customary malpractice action, thereby entitling the plaintiff to bring his action within the longer period limited for such claims.

*Simcuski v. Saeli*, 44 N.Y.2d 442, 406 N.Y.S.2d 259, 377 N.E.2d 713, 718 (1978); *accord Gotlin v. Lederman*, 05 Civ. 1899, 2006 WL 1154817, at *8 (E.D.N.Y. April 28, 2006) ("Generally, when a claim of fraud is pleaded in combination with medical malpractice and is based upon the same events, the plaintiffs may only proceed on the malpractice claim.").

To proceed with both claims, a plaintiff must demonstrate (1) "'knowledge on the part of the physician of the fact of his malpractice and of his patient's injury in consequence thereof'" and (2) "'a subsequent intentional, material misrepresentation by him to his patient known by him to be false at the time it was made, and on which the patient relied to his damage.'" *Atton v. Bier*, 12 A.D.3d 240, 785 N.Y.S.2d 426, 427 (1st Dep't 2004) (quoting *Simcuski*, 406 N.Y.S.2d 259, 377 N.E.2d at 718). As to this latter requirement, in order to prevail a plaintiff must also demonstrate unique damages specific to the purported fraud. *Gotlin*, 2006 WL 1154817, at *8 ("Plaintiffs must not only distinguish the elements of fraud and malpractice, they must also show unique damages in order to recover under the fraud theory.").

Here, the Court finds Plaintiff's stand-alone claim for fraud should be dismissed with leave to replead because he has not shown how it substantively differs from his medical malpractice claim. Though, arguably he has alleged special damages in the form of the cost of care (Dkt. No. 1 at ¶¶ 16-17), these fees are recoverable under his medical malpractice claim. *See Owen v. Applebaum*, 205 A.D.2d 976 (3d Dep't 1994) (plaintiff could not sue for both fraud and malpractice, since fraud damages for "fees paid to defendant" psychoanalyst were recoverable under malpractice); *Gotlin*, 2006 WL 1154817, at *9. Accordingly, the Court recommends this claim be dismissed with leave to replead.

### E. HIPAA Claims

In his complaint, Plaintiff alleges a HIPAA "violation of some sort" as a basis for a claim. (Dkt. No. 1 at ¶¶ 24-26.) Plaintiff does not elaborate on this claim and therefore it is unclear how or which of the myriad defendants putatively violated his HIPAA rights. From the best the Court can glean, the foundation of his claim could be his allegation that Dr. Bilal spoke to Plaintiff in a public hallway. (*Id*. ¶ 12.) However, Plaintiff has not articulated how this

violated his HIPAA rights and how he was damaged from such an action.  Nevertheless, even if

a HIPPA violation occurred, most of the Courts who have considered the issue have held HIPPA

does not provide a private cause of action to the individual but merely provides an enforcement

mechanism for the Secretary of Health and Human Services.  *See Knight v. Cty. of Cayuga*, No.

5:19-CV-712, 2019 WL 5067901, at *7 (N.D.N.Y. Oct. 9, 2019); *Bibeau v. Soden*, No. 808-CV-

0671, 2009 WL 701918, at *6 (N.D.N.Y. Mar. 13, 2009).  Accordingly, the Court recommends

the Plaintiff's HIPPA cause of action be dismissed without leave to amend.

## III.    MOTION TO APPOINT COUNSEL

As noted above, Plaintiff moved to appoint counsel.  (Dkt. No. 3.)  Plaintiff's application

indicates that he has been unsuccessful in his efforts to obtain *pro bono* counsel on his own and

lists three attorneys he supposedly contacted to represent him.  (*Id.*)  However, Plaintiff has not

attached any of the correspondence he received from these attorneys, as the form requires.  (*Id.*)

It also appears Plaintiff has yet to reach out to local not-for-profit law firms that focus

specifically on helping indigent plaintiffs.  Therefore, the Court denies Plaintiff's motion at this

time without prejudice and instructs Plaintiff to contact legal aid to see if they are willing to

represent him on this matter.[3]  If, after a diligent attempt, Plaintiff fails to obtain pro bono

counsel, he may renew his application to appoint counsel and specifically describe (1) his efforts

to obtain counsel; and (2) how his mental health issues would injure his ability to represent

himself in this matter.  The Court will then examine the relevant factors under *Hodge v. Police

Officers*, 802 F.2d 58, 61 (2d Cir. 1986), to determine whether appointment of counsel is

warranted.

---

[3]  Plaintiff is directed to the Court's website at: https://www.nynd.uscourts.gov/other-resources
for a list of legal aid organizations in the area.

**IV.    CONCLUSION**

For the reasons stated above, the Court recommends the following claims should remain: (1) a Section 1983 claim under the Fourth Amendment for an illegal seizure against Dr. Bilal; (2) a Section 1983 claim under the Fourteenth Amendment for a violation of his due process against Dr. Bilal; (3) a medical malpractice claim against Dr. Bilal; (4) a medical malpractice claim against Colleen Curr; and (5) a medical malpractice claim against Auburn Health Center.  The Court recommends the other defendants and other claims be dismissed with leave to replead, with the exception of the alleged HIPAA violation which the Court recommends be dismissed with prejudice.

Accordingly, it is

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**;[4] and it is further

**RECOMMENDED** that the Complaint (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE** and with leave to amend against Defendants Cayuga County Mental Health, Faith Emerson, and Dr. Michael Pratts except with regard to the alleged HIPAA violation which the Court recommends be dismissed with prejudice; and it is further

**RECOMMENDED** that Defendants Auburn Community Hospital, Dr. Ahmad Bilal, and Colleen Curr be required to respond to Plaintiff's claims for the alleged medical malpractice (Dkt. No. 1); and it is further

**RECOMMENDED** that Defendant Dr. Ahmad Bilal be required to respond to Plaintiff's claims regarding his Fourteenth and Fourth Amendment rights (Dkt. No. 1); and it is further

---

[4]  Plaintiff should note that although his IFP application has been granted, Plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that Plaintiff's motion to appoint counsel (Dkt. No. 3) is **DENIED** with leave to renew; and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on Plaintiff, along with a copy of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[5] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: November 25, 2019
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[5] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Carofino v. Forester, S.D.N.Y., August 31, 2006
2006 WL 1154817
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Gary D. GOTLIN., et al., Plaintiffs,
v.
Gilbert S. LEDERMAN, et al., Defendants.

No. 05-CV-1899 (ILG).
|
April 28, 2006.

**Attorneys and Law Firms**

Jonathan B. Behrins, Behrins & Behrins, P.C., Staten Island, NY, for Plaintiffs.

Mary Elizabeth Pearson, Kopff, Nardilli & Dopf, Nancy J. Block, Martin Clearwater & Bell LLP, New York, NY, Anthony Albert Lenza, Jr ., Amabile & Erman PC, Staten Island, NY, for Defendants.

*MEMORANDUM AND ORDER*

GLASSER, United States District Judge.

### INTRODUCTION

**\*1** This action is brought on behalf of Italian nationals, all of whom are now deceased due to their infliction with various types of cancer, against hospitals, administrators and physicians who treated them in the United States. Plaintiffs allege that defendants unlawfully induced them through misrepresentations to undergo a radiation procedure developed by defendants and that they forwent other treatment options as a result.

In a related case, the Court decided a similar motion to dismiss. (*See Gotlin v. Lederman,* 367 F.Supp.2d 349 (E.D.N.Y.2005) (Glasser, J.) (hereinafter *"Gotlin I"* )). Here, new plaintiffs bring claims arising from the same or similar factual circumstances. Indeed, as the parties admitted in oral argument, this case and that one are indistinguishable. (Transcript, 04-07-2006, 23:13-24:3). The estates of the deceased plaintiffs are represented by Gary D. Gotlin, the

New York State Richmond County Public Administrator. Plaintiffs sue the hospitals where they were treated, including, Staten Island University Hospital ("SIUH"), North Shore-Long Island Jewish Healthcare, Inc. ("North Shore LIJ"), and North Shore-Long Island Jewish Health System, Inc. ("North Shore LIJ-HS"), and various individuals who are administrators, executives or board members of those hospitals (collectively "Hospital Defendants"). [1]

They also sue individuals who encouraged plaintiffs to undergo or provided medical treatment. Those individuals include Gilbert S. Lederman, M.D. ("Lederman") and his professional corporation, Gilbert Lederman, M.D., P.C. ("Lederman PC"), Philip Jay Silverman, M.D. ("Silverman"), and Irina Grosman, M.D. ("Grosman") (collectively "Doctor Defendants"). The body of the Amended Complaint also describes the actions of Salvatore Conte ("Salvatore"), [2] an alleged agent of defendants who purportedly falsely held himself out to be an oncologist while promoting the treatment to prospective patients in Italy (*Am. Compl.* ¶¶ 51, 61, 63). Plaintiffs also sue other individuals, each of whom they allege was an "employee, servant, agent, representative partner and/or joint venturer and/or co-conspirator of the defendants." [3]

Pending before the Court is a motion pursuant to 12(b)(6) to dismiss the RICO and common law fraud claims in the Amended Complaint (attached as "Ex. B" to *Sola Decl.*). Defendants also move to dismiss certain other claims of particular plaintiffs because they fall outside of the applicable statutes of limitations. [4]

### BACKGROUND

**I. The Facts**
The relevant facts from the Amended Complaint are recited here. The Amended Complaint alleges that in late 2001 or early 2002, defendants launched an international patient program marketing Fractionated Stereotactic Radiosurgery ("FSR") treatment for various types of cancer. [5] (*Am. Compl.* ¶ 28). Plaintiffs allege that the defendants acted in concert and "promoted, marketed, and advertised their ... treatment to Italian nationals in Italy ..." (¶ 32). As a consequence, all plaintiffs participated in FSR treatments between 2001 and 2003. (¶ 30).

**\*2** Defendants are accused of having "lured and enticed patients ... by false fraudulent and deceitful advertisements

and misrepresentations." (¶ 34). The Amended Complaint recites from pamphlets, video advertisements, live conferences and other material produced by defendants a litany of claims about the FSR treatment that plaintiffs assert are "false fraudulent, misleading, and shocking" (¶¶ 37-56). For example, plaintiffs proffer that Lederman, then Director of Radiation and Oncology for defendant hospitals, created and disseminated a videotape touting a "90% success rate" for the surgery. (¶¶ 44, 45). Plaintiffs assert that defendants placed ads on both television and the internet to induce Italian cancer patients to submit a CT scan and 100 Euros to an agent of the defendants who would evaluate their cases. (¶¶ 48-51). Plaintiffs assert that defendants conducted seminars where they provided false information on the success rates of the surgeries, and that defendants Lederman, Nourbaha and Salvatore all participated. (¶¶ 57-64). At some of these conferences, Lederman purportedly stated that he could "cure" them. (¶ 68). Finally, defendants were sent information after acceptance stating that their cases were treatable. (¶¶ 76-77).

Plaintiffs assert that they reasonably relied upon the medical expertise of defendants, and were induced to pay $17,500 ("Fee") per person for the FSR treatment. (¶ 56). Plaintiffs contend that the defendants were grossly negligent in not verifying the truth of the claims made in their promotional literature; that they failed to use reasonable care in the employment, training, supervision, and retention of those defendants engaged in marketing the services; that they induced plaintiffs to undertake this "futile, unnecessary, and negligent treatment," while failing to adequately evaluate the patients or perform their own pathology studies; that they failed to obtain informed consent from their patients by not alerting plaintiffs to the benefits, risks, and alternatives regarding proposed treatments; that, as a consequence, the patients suffered "increased fatigue, weakness, nausea, vomiting, and pain ... after each administration" of FSR; that the hospital staff concealed their deteriorating conditions from them; that the "defendants' actions deprived the patients ... from obtaining ... necessary and appropriate care ...;" that the majority of the plaintiffs died shortly after treatment, and that plaintiffs' deaths "were hastened by the treatment" (¶¶ 83-128).

## II. The Claims
In a sprawling, 73-page Amended Complaint containing numerous redundancies, plaintiffs allege eight causes of action against the defendants.

Count I alleges violations of the N.Y.G.B.L. §§ 349 & 350, because during the years in question the defendants allegedly engaged in deceptive acts and practices in furnishing and falsely advertising their FSR treatment, inducing plaintiffs to participate in that care, causing them to lose an opportunity to receive appropriate treatment elsewhere, decreasing their probability of survival and/or quality of life. (*Am. Compl.* ¶¶ 135-143).

**\*3** Count II alleges common law fraud. (*Am. Compl.* ¶¶ 144-156). Plaintiffs assert that they reasonably relied upon the "systematic dissemination of misinformation and promotions of false hope designed to lure vulnerable cancer patients," paying $17,500 for the treatment. Plaintiffs assert that the following statements, among others, were false:
"Indeed, the vast majority of cancer treatments at Staten Island University Hospital with Body Radiosurgery-90 percent-are successful in the targeted area." (¶ 147).

"The vast majority of cancers (primary as well as metastatic) treated at Staten Island University Hospital are treated successfully in the targeted area-meaning cessation of growth, shrinkage or disappearance of the cancer." (*Id.*). "Many patients were so-called 'hopeless cases' before coming to Staten Island University Hospital." (*Id.*).

The Amended Complaint also recites success rates for various cancer treatments that it characterizes as outrageous, misleading and false representations, including success rates for liver cancers, liver metastases, primary lung carcinomas, pulmonary lung metastases, primary pancreas cancers, and other abdominal tumors at or above 88 percent for the targeted areas. (*Id.*).

Some of the statements from a videotape disseminated by defendants call the treatment "non-invasive," "highly successful," and offering "great hope to those who previously thought there was none." (¶ 148). Plaintiffs contend they relied upon these and similar statements in obtaining treatment and seek the return of their Fee as well as punitive damages and attorney's fees.

Count III alleges hospital and medical negligence. This count alleges that SIUH, North Shore-LIJ and North Shore-HS "failed, neglected, and/or intentionally refused to use reasonable care in the employment, training supervision, and the retention of those defendants engaging in the marketing, selling, and administering of [FSR]." They also allege that the defendants "refused to conduct an investigation of the

efficacy of administering [FSR]," particularly given the high rate of deaths after treatment. (*Am. Compl.* ¶¶ 157-164).

Count IV alleges medical malpractice against defendants Lederman, Lederman P.C., Silverman, and Grosman. Allegedly, these doctors either worked with or for the defendant hospitals and they administered medical services and treatments to plaintiffs. They allegedly "failed to exercise the knowledge, skill and diligence which a physician should have possessed and exercised," resulting in a failure to properly diagnose the plaintiff's conditions or provide requisite tests. They also allege that the Doctor Defendants failed to obtain informed consent form the patients regarding their treatments. As a result of this negligence, plaintiffs request $10,000,000 each in damages, including punitives. (*Am. Compl.* ¶¶ 165-208).

Count V asserts violations of N.Y.Pub. He. Law § 2805-d. Plaintiffs assert that defendants failed to disclose alternatives and the reasonably foreseeable benefits and risks of FSR treatment in a manner that would permit plaintiff decedents to give informed consent. Plaintiffs assert that no reasonable person would have undergone these services had they been fully informed of the relevant facts, and that their lack of informed consent was a proximate cause of their undergoing treatment and its resultant harms. They request $10,000,000 each and punitives for this count. (*Am. Compl.* ¶¶ 209-218).

**\*4** Count VI asserts wrongful death action on behalf of the "heirs and distributees of the decedents," seeking $10,000,000 and punitive damages. (*Am. Compl.* ¶¶ 219-223).

Count VII asserts loss of consortium on behalf of all surviving spouses. (*Am. Compl.* ¶¶ 224-226).

Count VIII asserts a RICO Violation of 18 U.S.C. § 1961 *et seq.* The Amended Complaint alleges that the corporate and individual defendants are "persons" pursuant to 18 U.S.C.A. § 1961(3), that they constitute an "enterprise" under 18 USC § 1961(4), that they engaged in a "pattern of racketeering activity" under § 1961(5), which included a variety of misdemeanors under New York State Penal Law § 190.20 and a class E felony under New York State Education Law §§ 6512 & 6513(1) law as well as over a hundred instances of mail and wire fraud under 18 U.S.C. §§ 1341 & 1343. They further allege that these violations constituted a "pattern of racketeering" prohibited by 18 U.S.C. § 1962(b) & (c). Plaintiffs assert that the allegedly false and misleading informational material provided to plaintiffs by defendants

"lured and enticed" them to pay the Fee for FSR treatment. Plaintiffs seek a return of the Fee only. (*Am. Compl.* ¶¶ 227-314).

## DISCUSSION

### I. 12(b)(6) Motion to Dismiss

#### A. Law

On a Rule 12(b)(6) motion, the Court accepts as true the factual allegations in the complaint, viewing it in light most favorable to the non-moving party. *Crespo v. New York City Transit Authority,* 2002 WL 398805 (E.D.N.Y.2002) (Glasser, J.) (citing *Bolt Elec., Inc. v. City of N.Y.,* 53 F.3d 465, 469 (2d Cir.1992)). Dismissal under Rule 12(b)(6) is only appropriate if "it appears beyond doubt that the Plaintiff can prove no set of facts in support of her claim which entitle her to relief." *Walker v. City of N.Y.,* 974 F.2d 293, 298 (2d Cir.1992). In essence, the question is not whether plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

When material outside the complaint is presented to the court it may either exclude that material or convert that motion to a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Fed.R.Civ.P. 12(b); *Chambers v. Time Warner Inc.,* 282 F.3d 147, 154 (2d Cir.2002). For purposes of this rule, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)); *see Fed.R.Civ.P.* 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). "... [A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough. (*Chambers,* 282 F.3d, at 153).

**\*5** If a motion is converted, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion...." *Fed.R.Civ.P.* 12(b). The primary concern is that the parties be able to anticipate the possibility that the motion might be converted, and thus have a reasonable

opportunity to meet facts outside of the pleadings. *In re G & A Books, Inc. v. Stern,* 770 F.2d 288, 295 (2d Cir.1985).

### B. Analysis

Here, defendants submit documents upon which the Amended Complaint does not necessarily rely. In particular, they offer documents which purportedly show that some of the patients' treatments ended years before the filing of this Complaint. (*See Sola Decl.,* Exs. G, H, I, J, K, L). These are presumably relevant because, if true, they would indicate that several of the plaintiffs claims are time-barred.

The Court excludes these documents from consideration. Here, there is no indication that plaintiffs relied upon them in framing the Amended Complaint, making it improper to consider them on a motion to dismiss. Moreover, since consideration of the material would harm the plaintiff who, without notice or discovery, would be forced to dispute the ultimately factual questions regarding the dates of treatment for those patients, the Court declines to convert this pre-answer motion to dismiss to one for summary judgment. It would be particularly egregious in a case such as this, where plaintiffs contend that defendants have withheld their medical records, to permit some portion of those records to be submitted by defendants in support of dismissal.

### II. RICO claims

In order to establish standing to sue under RICO, a plaintiff must show (1) a violation of substantive RICO such as 18 U.S.C. § 1962(2) injury to business or property; and (3) that the injury was caused by the violation. *Gause v. Morris,* 2000 WL 34016343, at *3 (E.D.N.Y.2000). Defendants seek dismissal of Count VIII of the Amended Complaint, since it alleges personal injuries which do not constitute "injury to property or business" as required by 18 U.S.C. § 1964(c). [6]

In *Gotlin I,* the Court addressed this same issue with respect to that complaint. Title 18 U.S.C. § 1964(c) provides: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court ..." (*Gotlin I,* 367 F.Supp.2d at 356) (quoting statute). An injury to business or property, of course, is a requisite for standing under § 1964(c). (*See, Town of W. Hartford v. Operation Rescue,* 915 F.2d 92, 100 (2d Cir.1990); *Gause v. Morris,* 2000 WL 34016343 at *3 (E.D.N.Y.2000). As noted in *Gotlin I,* "the requirement that the injury be to the plaintiff's business or property means that the plaintiff must show a proprietary type of damage." *Gotlin*

*I,* 367 F.Supp.2d at 356 (citing *Bankers Trust Co. v. Rhoades,* 741 F .2d 511, 515 (2d Cir.1984) *vacated on other grounds,* 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985)).

**\*6** In the *Gotlin I* RICO claim, plaintiffs argued that the $17,500 sum paid for FSR treatment prior to entry into the program constituted an injury to their "business or property." (*Gotlin I,* 367 F.Supp.2d at 357). This Court addressed that argument and rejected it:

> Plaintiffs' allegations are personal in nature, notwithstanding their incidental economic loss of $17,500 as payment for defendants' service. In analogous cases, courts routinely dismiss RICO claims in which plaintiffs allege personal injury as a result of alleged RICO violations.

(*Id.,* at 358).

Plaintiffs attempt to resuscitate the cause of action by contending that the Court's dismissal of the RICO claim was predicated upon personal injury damages, and that here plaintiffs seek relief only for the Fee-a damage to property. That complaint requested damages for the Fee as well as personal injuries from the treatment, alleged to be roughly $10,000,000 for each plaintiff. Although not entirely clear, the plaintiffs' interpretation of *Gotlin I* presumably is that the Court only considered the Fee damages as incidental to the personal injury, since they were pleaded together. Plaintiffs now attempt to reframe these damages as purely economic, presumably to remove this case from the scope of *Gotlin I.*

This argument has already been considered and rejected by this Court. When referencing plaintiffs' original argument, the Court summarized it as the contention "that they were injured in their business or property by virtue of defendants having extracted $17,500 from each plaintiff in advance of entry into the treatment program." (*Id.,* at 357). Nonetheless, this Court found that such a harm could not constitute an injury to their "business or property." (*Id.*).

The substance of the Amended Complaint is that defendants were fraudulently induced to participate in FSR treatment that defendants knew to be of no benefit to them, and that they were harmed in various ways as a result of that treatment. These harms are personal in nature, and the isolation of

a pecuniary harm within them does not alter the Court's analysis. To treat derivative claims as harms to business or property simply because they impose a monetary cost on plaintiff would, in the face of a near consensus in the circuits, expand RICO to cover virtually every conceivable harm, contrary to the statutory limitations. The fact that money is property is not enough, since, as this Court noted in *Gotlin I,* not all pecuniary or economic harms are compensable; those emanating from personal injuries are non-compensable. *Reiter,* 442 U.S. at 339. *See also, Shaw v. Rolex Watch U.S.A., Inc.,* 776 F.Supp. 128 (S.D .N.Y.1991); *James v. Lan-O-Tone Products, Inc.,* 1989 WL 61852 (S.D.N.Y.1989). [7]

In this regard, the rationale in *Le Paw,* cited in the *Gotlin I,* remains controlling. (*See, Le Paw v. Bat Indus. P.L .C.,* 1997 WL 242132 (E.D.N.Y.1997) (Gleeson, J.) (dismissing RICO claim against tobacco company where core injury alleged by plaintiffs was physical injury resulting from addiction, despite allegations that they only sought recovery on those claims for expenses incurred in purchasing cigarettes); *see also, Allman v. Philip Morris, Inc.,* 865 F.Supp. 665 (N.D.Ca.1994) ("the Court is unable to ignore that the core injury alleged in the complaint is addiction to nicotine.").

**\*7** Plaintiffs attempt to distinguish the present case from *Le Paw* and *Allman* by contending that they barred RICO claims predicated upon pecuniary harms that flowed from the costs incurred as a result of medical damages, whereas here the RICO claim arises from a Fee paid prior to treatment. At best, this is a distinction without a difference, and plaintiffs cite no authority indicating that the order in which pecuniary harms stemming from defendants' fraudulent behavior were incurred is determinative of the matter. A payment for services negligently rendered is incidental to that harm, since without it, plaintiffs presumably would have received value in return. That the payment occurred before or after the services is irrelevant.

Moreover, plaintiffs' attempt to distinguish the present case and *Le Paw* is not born out by that decision. In *Le Paw,* plaintiffs attempted to collect under RICO for their previous purchases of cigarettes. Such a purchase could, under plaintiffs' proposed interpretation, qualify as a "condition precedent" payment prior to subsequent adverse health affects. Judge Gleeson nevertheless found that such pay-outs were incidental to the health harms that formed the basis of the complaint. Plaintiffs cite to language in *Le Paw* indicating that those cigarette purchases were "the direct result of a physical addiction to nicotine." (*Le Paw,* 1997

WL 242132 at \*2). While one could infer from this passage that the court considered the purchase of cigarettes to be a consequence of addiction and not a precursor to the health harms flowing from smoking, it is clear in its application of *Allman* that, at the very least, the distinction was unimportant. The difference is irrelevant because the payment for medical services or cigarettes does not, by itself, give rise to the RICO claim. It is only with respect to a claim that plaintiffs were subsequently damaged-in this case by ineffective cancer treatments, that those initial payments are transformed into actionable damages.

While plaintiffs may certainly plead in the alternative, they cannot simply ignore the underlying substance of the suit in asserting a RICO violation. Plaintiffs assert that, hypothetically, had a plaintiff "paid the money and then decided not to travel to the United States, he or she still would have had a valid RICO claim if her money was not refunded." (Plts.Mem.27). The hypothetical does not properly summarize the facts as they are before this Court. Whether it constitutes a RICO violation this Court need not decide.

Plaintiffs also argue that in the event the Court finds *Le Paw* applicable, it should employ an expansive reading of the RICO statute as urged in *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S .Ct. 2326 (1979) (RICO statute construed broadly to serve the statute's remedial purposes). As noted in *Shaw v. Rolex Watch U.S .A., Inc.,* 776 F.Supp. 128, 135 (S.D.N.Y.1991), however, "reference to RICO's broad remedial purposes cannot alter the unambiguous language of the statute." The purpose of civil RICO liability "does not extend to deterring any illegal act .... for which there are state and common law remedies." *Town of W. Hartford,* 915 F.2d, at 104 (citing *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 24 (2d Cir.1990)). Here, plaintiffs cannot overcome the "business or property" limitation, and therefore defendants' motion to dismiss the RICO claims is granted.

### III. Fraud Claims

**\*8** Plaintiffs assert fraud claims similar to those dismissed in *Gotlin I.* A fraud claim requires that plaintiff show the following elements: (1) defendant makes a material false representation, (2) intended to defraud plaintiff thereby, (3) plaintiff reasonably relied upon the representation, and (4) plaintiff suffered actual damages. *See, United Artists Theatre Circuit, Inc. v. Sun Plaza Enterprise Corp.,* 352 F.Supp.2d 342, 351 (E.D.N.Y.2005); *New York Univ. v. Continental Ins. Co.,* 87 N .Y.2d 308, 318 (N.Y.Ct.App.1995) (Under New York law, the essential elements of fraud are

"representation of a material existing fact, falsity, *scienter,* deception and injury"). There must be some causal connection between the misrepresentation and the injury suffered. (*Cf., Silivanich v. Celebrity Cruises, Inc.,* 171 F.Supp.2d 241, 273 (S.D.N.Y.2001).

Generally, when a claim of fraud is pleaded in combination with medical malpractice and is based upon the same events, the plaintiffs may only proceed on the malpractice claim. Plaintiffs must not only distinguish the elements of fraud and malpractice, they must also show unique damages in order to recover under the fraud theory. *See Luciano v. Levine,* 232 A.D.2d 378, 379, 648 N . Y.S.2d 149 (2d Dep't 1996) (dismissing fraud claim based on representations that plastic surgery treatments were safe where plaintiff did not allege an injury different from the underlying malpractice); *Owen v. Applebaum,* 205 A.D.2d 976 (3d Dep't 1994) (plaintiff could not sue for both fraud and malpractice, since fraud damages for "fees paid to defendant" psychoanalyst were recoverable under malpractice); *Spinosa,* 168 A.D.2d at 41-42 (dismissing fraud claim, in light of a negligence claim alleging defendant podiatrist's failure to obtain plaintiff's informed consent for surgery, since injuries alleged were the same under both theories).

The purpose in barring the fraud claim is to prevent litigants from availing themselves of the more favorable statute of limitations for fraud, since the New York legislature limited the time in which medical malpractice claims can be brought to 2 years and 6 months. (C.P.L.R. § 214-a). (*Cf. Simcuski v. Saeli,* 44 N .Y.2d 442, 451-52 (1978)). A plaintiff is not entitled to the longer statute of limitations for fraud by virtue of pleading a malpractice claim in an alternate manner. (*Adamson,* at *3).

Plaintiffs' fraud claim alleges, among other things, that the defendants provided false and misleading information on the success rates of FSR treatment on various cancers in order to induce them to pay the Fee. In *Gotlin I,* the Court determined that the allegations of fraud were sufficiently distinct from the malpractice claims so as to constitute a separate cause of action. 367 F.Supp.2d at 358. Nevertheless, since the claim arose from the same nexus of facts and since the damages were the same, the fraud claim had to be dismissed. *Id.* The Amended Complaint's assertion of damages based solely on the Fee does not make that harm distinct-ultimately it is also an incidental harm associated with the malpractice claims.

**\*9** Contrary to plaintiffs' suggestion here, a plaintiff who prevails on a malpractice claim can also recover at least some portion of the fees paid for the services. Indeed, recoupment of that fee may form the basis for a counterclaim. "The right to claim malpractice is both a defense to an action to recover for professional services and a predicate for a counterclaim, and if used for either purpose, that is, either by way of defense or recoupment, it destroys the vitality of the claim, if it is later sought to be used in an independent action." *Kossover v. Trattler,* 104 Misc.2d 424, 428 (N.Y.Sup.Ct.1980); aff'd, 82 A.D.2d 610. *See also Kissimmee Memorial Hosp. v. Wilson,* 188 A.D.2d 802, 803 (3d Dep't 1992).

As in *Gotlin I,* plaintiffs argue that the damages were not incidental to the malpractice suit, but instead "the immediate consequence of a despicable fraud .... and a condition precedent to their participation in defendant's program." Plts. Mem Law, 16.

The highest court of New York State has defined the circumstances in which a fraud claim and a malpractice claim arising from the same nexus of events can be asserted in a single action. The Court of Appeals held in *Simcuski* that a complaint properly states two distinct claims, one sounding in fraud and the other in medical malpractice, when (1) the physician knew or had reason to know of his malpractice and an injury suffered by patient as a consequence thereof, (2) the physician subsequently, knowing it to be false at the time, made a factual misrepresentation to the patient with respect to the malpractice and the therapy appropriate to remedy the problem, (3) the patient's justifiable reliance on that misrepresentation, (4) there was an efficacious or available remedy or cure which the plaintiff was "diverted from undertaking in consequence of the intentional fraudulent misrepresentation." (*Simcuski,* 44 N.Y.2d at 454).

From this description, it is obvious that *Simcuski* contemplates the simultaneous assertion of both intentional fraud and medical malpractice claims when the fraud has added to the damages caused by the initial malpractice. It is not, as is the case here, available when the plaintiff pays a fee for a treatment that subsequently causes him harm. As this is plaintiffs' only allegation in the common law fraud claim, it cannot be sustained independently. As noted in *Coopersmith:*

> It is only when the alleged fraud occurs separately from and subsequent to the malpractice that a plaintiff is entitled to allege and prove a cause of action for

intentional tort ... and then only where the fraud claim gives rise to damages separate and distinct from those flowing from the malpractice.

(172 A.D.2d at 984).

Although the plaintiffs' attempt at distinguishing Simcuski is not unreasonable, plaintiffs have not substantiated it with any New York state or federal courts. Likewise, this Court has failed to uncover any case employing plaintiffs' theory to effect. Plaintiffs' novel argument is contrary to the nearly unanimous application of *Simcuski* where the alleged misrepresentations occurred prior to services being rendered. *See Adamson v. Bachner,* 2002 WL 31453096, at *3 (S.D.N.Y. Oct. 31, 2002) (attorney malpractice action where failure to disclose potential conflict relationship was "duplicative of the malpractice claim"); *Romatowski v. Hitzig,* 227 A.D.2d 870, 872 (3d Dep't 1996) (fraud claim barred where pamphlet and other representations regarding hair transplant gave rise to the same damages actionable under malpractice claim); *Luciano, supra,* 232 A.D.2d 378 (prior to each treatment, doctor allegedly told plaintiff treatment was safe, but these representations resulted in merger with malpractice claim); *Owen,* 205 A.D.2d 976 (plaintiff's allegation that she was continuing to pay for psychoanalysis services but that treatments were not, in fact psychoanalysis, was not distinct from malpractice claim, and did not articulate separate theory of damages); *Spinosa, supra,* 168 A.D.2d at 41-42 (doctor's promise that surgery would result in beautiful feet did not give rise to separate malpractice action); *Harkin v. Culleton,* 156 A.D.2d 19 (1st Dep't 1990). Whether this Court would make an exception to this rule if it were writing on a clean slate is another matter. Here, it is clear that the damages supporting the fraud claim could be claimed as stemming from malpractice, making the fraud claim barred.

 **\*10** The Court has reviewed plaintiffs' other arguments with respect to the damages element of the fraud claim and finds them without merit. Defendants also contend that the fraud claim is not pleaded with particularity. The Court does not reach this argument because dismissal is proper on account of the foregoing analysis.

**IV. Statute of Limitations Claims**

Finally, defendants move to dismiss several claims they assert are time-barred. Specifically, defendants assert that the medical malpractice, lack of informed consent, wrongful death, and N.Y.G.B.L. §§ 349 & 350 claims of several of the plaintiffs should be dismissed. In opposition, plaintiffs argue that the defendants have failed to provide them with their medical records and have intentionally and fraudulently attempted to discourage and/or prevent them from obtaining those records, and therefore should be estopped from asserting this defense. In the alternative, they request that a hearing be held on the defense. For the following reasons, the Court denies defendants' motion for dismissal based on the statute of limitations.

State law statutes of repose govern state-law claims in diversity cases. *Morse v. Elmira Country Club,* 752 F.2d 35 (2d Cir.1984); *Reid v. City of New York,* 736 F.Supp. 21, 25 (E.D.N.Y.1990). Generally, under New York law, the statute of limitations is considered an affirmative defense involving questions of fact "which should be fully developed and determined upon the trial of the action." *Century Fed. S & L Ass'n of Long Is. v. Net Realty Holding Trust,* 87 A.D.2d 858 (2d Dep't 1982). *See also, Kamruddin v. Desmond,* 293 A.D.2d 714 (2d Dep't 2002); *Croop v. Odette,* 29 Misc.2d 606, 607 (N.Y.Sup.Ct.1960) (statute of limitations defense asserted on a motion to dismiss is, in effect, a summary judgment motion, and best to be heard at trial). *See also Fed.R.Civ.P.* 8(c); C.P.L.R. § 3018(b). Of course, dismissal based on a limitation on actions may be appropriate when the bar to relief appears on the face of the complaint. *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.1992).

"Fraudulent representations may ..., in equity, be a basis for an equitable estoppel barring the defendants from invoking the statute of limitations as against a cause of action for breach of fiduciary relations." *Simcuski,* 44 N.Y.2d at 448. The New York Court of Appeals has determined that estoppel is "peculiarly appropriate" in medical malpractice cases, given the "unquestioning reliance which such relationship may be expected to engender in the patient." *Simcuski,* 44 N.Y.2d at 449. Failure to provide medical records may form the basis of an estoppel argument. "Where a medical malpractice claim is asserted, the patient's medical records are material to reaching a responsible decision on whether there is grounds for a lawsuit." *Kamruddin,* 293 A.D.2d, at 715.

When the conduct giving rise to the estoppel ceases to be operative prior to the expiration of the statute of limitations, and the plaintiff has had opportunity to timely commence his

action, then the estoppel does not act to extend the period in which the action may be brought. *Id.,* at 449-50 (citing *Sixth Ave. Corp. v. New York City Tr. Auth.,* 24 A.D.2d 975 (1st Dep't 1965)).

 **\*11** Where, however, the conduct relied upon ceases to be operational after the expiration of the period of limitations, the New York Court of Appeals has stated that the action may be timely only if the plaintiff demonstrates, upon asserting the estoppel, that he was duly diligent in bring the action. *Simcuski,* at 450 ("[T]he burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational."). The plaintiff must also demonstrate that the reliance on the actions giving rise to estoppel were justified. (*Id.,* at 449). However, the fact that a claim is under investigation "despite the intentional concealment does not preclude application of the doctrine of equitable estoppel.... The determinative factor is whether there is purposeful concealment." *Kamruddin,* 293 A.D.2d at 715.

Although it appears that several of the plaintiffs' claims would be time-barred because they died or derive their claims from an individual who died prior to the earliest date covered by this action, plaintiffs' pleadings, accepted as true for these purposes, allege that plaintiffs have diligently attempted to acquire their medical records concealed by defendants. The Amended Complaint alleges that "the defendants systematically and repeatedly denied patients .... access to and copies of their medical records, test results, films, or any documentation or information." (*Am. Compl* . ¶ 118). It further alleges that "the defendants inexplicably ignored patients' requests, and the requests of their Italian oncologists, for their treatment records in defendants' possession." (¶ 119). Finally, the Amended Complaint asserts that "the patients, including the plaintiffs herein, repeatedly made desperate pleas for their medical records to the defendants as their conditions rapidly deteriorated during their stay at defendants' facilities and/or upon returning to Italy, but these pleas were inexplicably ignored by the defendants." (¶ 120). Finally, plaintiffs allege that some comments made by their doctors concealed harm caused by treatment. (¶ 124). As noted in *Simcuski,* an affirmative representation made subsequent to malpractice may support a plaintiff's assertion of equitable estoppel. 44 N.Y.2d, at 452. Taking the Amended Complaint's allegations as true and granting them every inference as the Court must on a motion to dismiss, these arguments are sufficient to support an estoppel argument based on an intentional concealment of records.

Defendants' arguments are insufficient to preclude the possibility of estoppel. Defendants improperly focus on the question of evidence. First, defendants argue that "equitable estoppel must be established by the party seeking to assert it," and "plaintiffs fail to establish that .... a factual scenario warranting equitable estoppel exists." (Def.Rep.Mem.9-10). Defendants also assert that plaintiffs have submitted "no documentation or other evidence of their efforts in support of their contentions." Defendants are correct that plaintiffs will eventually have to establish estoppel, but the lack of factual evidence at this point cannot serve as a basis for dismissal, since at this stage plaintiffs need only plead the necessary facts. When there is a dispute as to whether estoppel is proper it is largely considered a question of fact to be determined after a development of the record. [8]

 **\*12** Additionally, defendants make several arguments from which one might infer that they did not purposefully conceal plaintiffs' medical records, including their assertion that they informed plaintiffs' counsel how to obtain those records. These cannot overcome the presumptions afforded plaintiffs' on this posture. Ultimately, these assertions go to the factual question of whether or not plaintiffs can prove concealment.

Next, defendants argue that *Kamruddin* is distinguishable because there, the plaintiff made a written demand for the records which was not complied with by defendant. Although defendants' description of *Kamruddin* is factually correct, the same cannot be said of the weight they provide it. By no means does the case stand for the proposition that defendants imply that it does-that plaintiffs' actions here are insufficient as a matter of law. *Kamruddin* did not reach the question of what type of diligent request satisfied plaintiff's obligation. There, plaintiff made a demand in writing that fulfilled it. That writing was deemed sufficient, but it was neither said nor implied that a written demand was obligatory. Here, plaintiffs have pleaded that they have tried in vain to obtain their records. This does not entitle them to a determination in their favor, but it does entitle them to present a case on the issue.

Defendants contend that plaintiffs cannot have justifiably relied upon any alleged concealment in delaying so long to bring their claims, citing *Dunefsky v. Montefiore Hosp. Med. Ctr.,* 162 A.D.2d 300, 556 N.Y.S.2d 645 (1st Dep't 1990) (granting defendant's motion for summary judgment where complaint was prepared without access to the medical records). *Dunefsky* does not stand for the proposition that the eventual filing of a complaint prior to receiving medical

records obviates any equitable estoppel claim resulting therefrom-such an expansive reading of *Dunefsky* would contradict the New York Court of Appeals admonishment in *Simcuski* that "it would not be tolerable to permit a physician by whose fraud, misrepresentation or deception his patient has been induced to delay filing legal proceedings until after the time limited by statute to reap the benefits of his own misconduct." 44 N.Y.2d, at 454. Rather, *Dunefsky* is better read as confined to its facts. When it is alleged that plaintiffs were mislead by their doctors into believing that treatment was working, and further alleged that hospitals have failed to turn over medical records despite the persistent attempts by their patients to acquire them, the defendant forces the plaintiff to choose between the lesser of two evils-file a malpractice claim without the benefit of medical records or risk being time-barred. This is precisely the bind prohibited by *Simcuski*. [9]

Moreover, the question of whether or not a plaintiff has justifiably relied on misrepresentations is generally a question of fact. The determination in *Dunefsky* was made on a motion for summary judgment. McIvor v. DiBenedetto, 121 A.D.2d 519 (2d Dep't 1986), a case relied upon in *Dunefsky* for the aforementioned proposition, found, on summary judgment, that plaintiff was not entitled to an equitable estoppel defense given the overwhelming evidence that plaintiff had been alerted to the malpractice, yet failed to so much as inquire into its causes. The *McIvor* court noted that "[g]enerally, the issue [of equitable estoppel] is not a question of law, but rather a question of fact." (*Id.*, at 523). It nonetheless found it to be the rare case where the plaintiff's own testimony as to her knowledge of the circumstances of the death prior to the expiration of the statute of limitations imposed upon her a duty to further inquire. (*Id.*).

**\*13** A vast majority of the cases on equitable estoppel permit plaintiffs to defeat a motion to dismiss on the pleadings, deferring the question until some discovery can be had. Candelaria v. Erickson, 2005 WL 1529566 (S.D.N.Y., Jun. 28, 2005); Putter v. North Shore Univ. Hosp., 25 A.D.3d 539, (2d Dep't 2006); Contento v. Cortland Memorial Hosp., 237 A.D.2d 725, (3d Dep't 1997); Valenti v. Trunfio, 118 A.D.2d 480, (1st Dep't 1986); Krol v. Valone, 80 A.D.2d 997, (4th Dep't 1981); Chisolm v. New York Hosp., 181 Misc.2d 68, (N.Y.Sup.Ct.1999). Since equitable estoppel claims involve multiple questions of fact, they are generally not decided until at least some discovery is allowed.

## *CONCLUSION*

For the foregoing reasons, the defendants' motion to dismiss with respect to the common law fraud and RICO claims is granted, and with respect to the statute of limitations assertions is denied. The parties are directed to attend a status conference before this Court on Friday, May 12, 2006 at 10:30 a.m., to determine how best to proceed.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2006 WL 1154817

## Footnotes

1  The administrators or employees of those hospitals include Andrew J. Passeri, Alfred L. Glover, Rlaph J. Lambert, Gerald Ferlisi, Anthony C. Ferreri, Betsey Mercerau, Rick J. Varone, Joesph R. Pisani, Dale Tait, John L. Costello, John A. D'Anna, and John M. Shall.

2  Although listed in the body of the Amended Complaint, Salvatore is not identified as a defendant in this case. Salvatore was voluntarily dismissed from the companion case *Gotlin I* pursuant to 41(a)(1).

3  Those individuals include Joseph Conte ("Joseph") and Maria Gelmi-Nourbaha ("Nourbaha").

4  Initially, defendants also moved to dismiss the Amended Complaint as to Americo Varone pursuant to 12(b)(2) and 12(b)(4) for lack of personal jurisdiction and insufficiency of process. Plaintiffs provide an Affidavit of Service indicating that Americo J. Varone was properly served on July 1, 2005. Since this service falls within the 120 day window provided by Fed.R.Civ.P. 4(m) and defendants do not further contest this service, the Court holds that Varone was properly served.

5  FSR involves "... precision radiation using multiple, finely contoured beams from many different angles-all directed at the cancer, minimizing radiation to normal healthy tissue." (¶ 29).

6  Defendants do not currently contest other elements of a RICO claim which must be pleaded under 18 U.S.C.1962(b) & (c).

7  Though the Second Circuit has not directly addressed the issue, other Circuits have held that economic damages resulting from personal injuries are not actionable under RICO. (*See* Bast v. Cohen, Dunn & Sinclair, P.C., 59 F.3d 492 (4th

Cir.1995) (pecuniary losses flowing from extreme mental anguish do not constitute injury to property); *Doe, supra,* 958 F.2d at 770 ("payment" for legal fees with sexual services not an injury to property, nor were miscellaneous expenses flowing distress resulting therefrom); *Genty v. Resolution Trust Corp.,* 937 F.2d 899 (3d Cir.1991) (medical expenses for harms due to exposure to toxic waste not compensable as injury to property); *Grogan v. Platt,* 835 F.2d 844, 848 (11th Cir.1988) (economic damages, including loss of income, resulting from murder not actionable); *Drake v. B.F. Goodrich Co.,* 782 F.2d 638, 643-44 (6th Cir.1986) (RICO not applicable to wrongful death action). *But see Diaz, supra,* 420 F.2d 897 (basing loss of property on underlying state law torts of interference with prospective business relations).

8    In this regard, defendants appear to have the proper standard of review wrong, asserting that "plaintiffs have failed to submit admissible evidence to support a claim of equitable estoppel," citing *Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d. Cir.1994) and *Hamptons Locations, Inc., v. Rubens,* 2005 WL 2436209 (E.D.N.Y.2005). These cases are inapplicable as they refer to summary judgment standards of review.

9    Defendants also contend that plaintiffs cannot have relied upon the medical records, since they filed the complaint without them, noting that, unlike the Certificate of Merit requirement for the filing of a medical malpractice action in state Court (*See* C.P.L .R. § 3012-a), Fed.R.Civ.P. 11(b)(3) only requires that the attorney, to the best of the person's knowledge, have evidentiary support for their assertions or believe that such support could be obtained by further investigation or discovery. The argument is unavailing for the same reason-defendants may not benefit from their own wrong. Moreover, the question of whether defendants are equitably estopped is governed by state law, which considers an unreasonable delay in producing medical records a valid justification for applying the doctrine. (*Cf. Arbutina v. Bahuleyan,* 75 A.D.2d 84, 87 (4th Dep't 1980) ("We hold, therefore, that an unreasonable delay in delivering hospital records to an attorney consulted in a suspected case of malpractice may result in defendants being estopped from later asserting the Statute of Limitations if the delay prevented the timely commencement of an action.").

---

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 5067901
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Julie KNIGHT, Plaintiff

v.

COUNTY OF CAYUGA; Cayuga County Health
Department; Nancy Purdy, Individually and in
her capacity as an employee of Cayuga County;
Kathleen Cuddy, Individually and in her capacity
as an employee of Cayuga County; and Michael
Russell, Individually and in his capacity as
an employee of Cayuga County, Defendants.

5:19-CV-712
|
Signed 10/09/2019

**Attorneys and Law Firms**

OF COUNSEL: JARROD W. SMITH, ESQ., OFFICE OF
JARROD W. SMITH, Attorneys for Plaintiff, 11 South Main
Street, P.O. Box 173, Jordan, New York, 13080.

OF COUNSEL: CHARLES C. SPAGNOLI, ESQ., OFFICE
OF FRANK W. MILLER, Attorneys for Defendants, 6575
Kirkville Road, East Syracuse, NY 13057.

## MEMORANDUM–DECISION and ORDER

DAVID N. HURD, United States District Judge

## I. INTRODUCTION

 *1 For approximately eighteen years, plaintiff Julie Knight
("Knight" or "plaintiff") worked for defendant Cayuga
County Health Department ("the department"), and by
extension the County of Cayuga ("Cayuga" or "the county").
For much of that time, but especially beginning in 2012,
plaintiff suffered from severe anxiety and post-traumatic
stress disorder. Plaintiff contends that her supervisors,
defendants Kathleen Cuddy ("Cuddy") and Nancy Purdy
("Purdy") exacerbated these issues by disregarding her
complaints of a hostile work environment and by interfering
with her leave under the Family and Medical Leave Act,
29 U.S.C. §§ 2601-54 ("FMLA"). She also alleges that
defendant Michael Russell violated her rights under the
Health Insurance Portability and Accountability Act, 42

U.S.C. §§ 1320d-1320d-9 ("HIPAA") by disclosing her
protected medical information.

On June 15, 2019, plaintiff brought this complaint. Plaintiff
raises six concrete federal claims: (1) retaliation for exercising
her First Amendment right to free speech under 42 U.S.C. §
1983 ("§ 1983"); (2) a violation of her right to due process
under the Fourteenth Amendment through § 1983; (3) a
violation of her Eighth Amendment right to be free from
cruel and unusual punishment under § 1983; (4) violations of
her HIPAA rights; (5) violations of her rights under FMLA;
and (6) violations of her rights under the Americans with
Disabilities Act, 42 U.S.C. §§ 12101-213 ("ADA"). Plaintiff
also raises five claims under New York common and statutory
law: (1) false imprisonment; (2) assault and battery; (3)
intentional infliction of emotional distress; (4) retaliation
against plaintiff's protected activity as a whistleblower;
and (5) general negligence including negligent infliction of
emotional distress. Plaintiff also makes references in passing
to libel, slander, equal protection, and negligent hiring,
retention, and training.

Defendants have moved to dismiss the complaint under
Federal Rule of Civil Procedure ("Rule") 12(b)(1) for a lack
of subject matter jurisdiction, 12(b)(2) for lack of personal
jurisdiction, 12(b)(5) for insufficient service of process, and
12(b)(6) for failure to state a claim. They have also moved
under Rule 12(f) to strike allegations in the complaint that
Knight observed Cuddy in an extramarital liaison. Knight has
cross-moved for leave to amend her complaint under Rule
15(a)(2). In their reply to plaintiff's cross-motion, defendants
conceded that their arguments regarding this Court's lack
of personal jurisdiction and the purported lack of service of
process were both nullified by plaintiff's response.

## II. BACKGROUND

For approximately eighteen years before January 28, 2019,
Knight worked for the department in the cancer services
program.[1] Dkt. 1, ¶ 14-15. In March of 2009, Deanna Ryan
("Ryan"), along with a few of plaintiff's other coworkers,
accused plaintiff of creating a hostile work environment. Id.
¶ 16. Although the complaint was dismissed, the accusation
had a deleterious effect on plaintiff's mental wellbeing. Id.
But that complaint was only the first stone cast at plaintiff
by her coworkers, including not speaking to her, laughing at
her, and building a wall to separate her from the rest of the
office. Id. ¶¶ 17-20. These slights continued for the remainder
of plaintiff's time at the department. Id.

**\*2** In January of 2012, Knight and her husband were going through a divorce. Dkt. 1, ¶ 21. The divorce, combined with the stress of her work environment, worsened plaintiff's anxiety and post-traumatic stress disorder. *Id.* ¶¶ 23, 25. In July of 2012, plaintiff asked to speak with Cuddy concerning her issues in the workplace, but she was so anxious that they needed to meet at a local coffee shop rather than in the office. *Id.* ¶ 23.

Finally, in 2013, Knight's mental health deteriorated to such an extent that she would suffer from debilitating panic attacks. Dkt. 1, ¶ 25. These panic attacks would occasionally force plaintiff to leave work, and on occasion leave her bedridden for days. *Id.* As a result, plaintiff became entitled to leave under the FMLA. *Id.*

Between 2013 and 2017, Knight's relationship with her coworkers continued to fester, and Ryan issued another unfounded complaint against her. Dkt. 1, ¶¶ 26-27. In July of 2017, Cuddy withheld plaintiff's FMLA re-certification materials from human resources. *Id.* ¶ 29. In response, plaintiff's union, the Civil Service Employees of America ("the union") threatened suit. *Id.* Although this defendant disclosed the materials, the union advised plaintiff to file a lawsuit concerning the bullying taking place in her workplace. *Id.* ¶¶ 29-30.

In October of 2017, Cuddy placed Knight on time abuse and informed her that she would not count the time off that she was taking as FMLA time. Dkt. 1, ¶ 31. In the winter of 2018, a Cayuga employee approached plaintiff about time abuse and her alleged misuse of FMLA. *Id.* ¶ 33. According to that employee, defendant Russell, who worked in human resources, had informed her of these violations, contrary to HIPAA's mandate. *Id.* ¶¶ 33, 57.

During May of 2018, Knight's relationship with the department began to deteriorate rapidly. On May 16, 2018, Purdy informed plaintiff that she would be forced to relocate her office near Ryan's. Dkt. 1, ¶ 34. This news triggered plaintiff's anxiety, and she was forced to take FMLA leave the next day, May 17. *Id.* ¶¶ 35-36. Plaintiff spoke to Cuddy on May 18 and described how severely the potential move had affected her. *Id.* ¶ 37. Cuddy responded that there had been no formal decision yet. *Id.* On May 28, 2018, Purdy, at Cuddy's suggestion, denied plaintiff's FMLA time for May 17, because employees stated that plaintiff did not seem upset when she left on May 16. *Id.* ¶ 38.

On May 31, 2018, Knight met with the department's human resources and the union. Dkt. 1, ¶ 39. At the meeting, she presented a doctor's note clarifying that the unexcused absence on May 17, 2018 was caused by her anxiety and post-traumatic stress disorder. *See id.* Plaintiff also explained that Ryan exacerbated her symptoms to such an extent that she could not work near her. *See id.* ¶ 40. Nevertheless, on June 21, 2018, Purdy called plaintiff into her office. *Id.* ¶ 43. She confirmed plaintiff would be moved near Ryan. *Id.* This news caused plaintiff to suffer a panic attack. *Id.* Plaintiff requested to leave her office several times but was refused. *Id.* Instead, this defendant blocked her in the office, and prevented plaintiff from leaving. *Id.*

Purdy then twice grabbed Knight's arms, bruising her. Dkt. 1, ¶ 44. Plaintiff asked her to let go both times. *Id.* Plaintiff's husband then called, and she told him that this defendant had refused to let her leave the office. *Id.* At this point, this defendant told plaintiff that if plaintiff left work, she would call the police and an ambulance. *Id.* Instead, she ordered plaintiff to call her husband and have her pick her up. *Id.* Plaintiff filed a workplace violence claim against this defendant on August 14, 2018, although it led to no result. *Id.* ¶ 53. This incident left plaintiff fearful of Purdy. *Id.* ¶ 56.

**\*3** On June 22, 2018, Knight asked for an FMLA day because of the panic attack she suffered on June 21. *Id.* ¶ 45. On June 26, 2018, plaintiff received an email informing her that she must move her office near Ryan's that morning. Dkt. 1, ¶ 46. Plaintiff objected that this would aggravate her anxiety and post-traumatic stress disorder. *Id.* ¶ 47. The department's human resources division agreed to speak to the union, and until they did, plaintiff was allowed to remain in her original office. *Id.* ¶ 48. The department decided on giving plaintiff until July 13, 2018 to submit documents from her doctor supporting that she could not be required to move near Ryan. *Id.* ¶¶ 49-51.

On September 15, 2018, Knight took a week of vacation time, during which she had an elective surgery. Dkt. 1, ¶ 54. The department improperly counted this surgery against plaintiff's FMLA leave. *Id.*

On December 20, 2018, the department filed a Notice of Disciplinary Action against Knight. Dkt. 1, ¶ 58. The next day, plaintiff had been scheduled to testify regarding a notice of claim she had submitted against the department. *Id.* As a result of the disciplinary action, plaintiff was interrogated by the

department on December 24, 2018. *Id.* ¶ 59. The interrogation concerned a missing contract that plaintiff had submitted, but to which she had not yet received a response. *Id.* Plaintiff had emailed Cuddy concerning this missing contract and had asked for her help. *Id.* She received no response. *Id.* Plaintiff attributes this lack of response and the subsequent discipline both to retaliation for her filing the notice of claim, and to Cuddy's personal vendetta brought on by plaintiff's witnessing her extramarital affair on September 25, 2018. *Id.* ¶¶ 59, 60. As a result of the investigation and her continued struggles with her coworkers, plaintiff resigned from her position on January 28, 2019. *Id.* ¶ 14.

Knight brought the present complaint on June 15, 2019. Dkt. 1. On July 15, 2019, defendants moved to dismiss the complaint under Rule 12(b)(1), (2), (5), and (6), and to strike plaintiff's allegations of Cuddy's extramarital affair under Rule 12(f). Dkt. 5. Plaintiff cross-moved for leave to amend her complaint on August 30, 2019. Dkt. 13. The motions having been fully briefed, they will now be considered on the basis of the parties' submissions without oral argument.

### III. LEGAL STANDARD

#### A. SUBJECT MATTER JURISDICTION.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). "In determining the existence of subject matter jurisdiction, a district court may consider evidence outside the pleadings." *Saleh v. Holder*, 84 F. Supp. 3d 135, 137-38 (E.D.N.Y. 2014) (citing *Makarova*, 201 F.3d at 113). "Subject matter jurisdiction is a threshold issue and, thus, when a party moves to dismiss under both Rules 12(b)(1) and 12(b)(6), the motion court must address the 12(b)(1) motion first." *Id.* at 138 (citations omitted). [2]

#### B. FAILURE TO STATE A CLAIM.

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Instead, the complaint must contain sufficient factual matter that it presents a claim

to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing the plausibility of the plaintiff's complaint, "the complaint is to be construed liberally, and all reasonable inferences must be drawn in the plaintiff's favor." *Ginsburg*, 839 F. Supp. 2d at 540. The complaint may be supported by "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citing *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).

### IV. DISCUSSION

**\*4** Defendants have moved to dismiss Knight's complaint on fourteen grounds: (1) plaintiff's First Amendment claim is meritless because she only spoke of personal matters; (2) plaintiff's § 1983 claims against the county are not cognizable under *Monell*: (3) plaintiff does not allege a due process claim; (4) there is no private cause of action under HIPAA; (5) plaintiff has not sufficiently pled an FMLA claim; (6) plaintiff has not sufficiently pled an ADA claim; (7) plaintiff's negligence claims are barred by New York worker's compensation law; (8) plaintiff's state law claims accruing prior to July 28, 2018 are barred because she did not file a timely notice of claim; (9) plaintiff has not adequately pled that she merits protection as a whistleblower; (10) plaintiff's claim for indifference to her mental health is not cognizable; (11) plaintiff has adequately pled neither intentional nor negligent infliction of emotional distress; (12) the department is not a separate entity from the county; (13) defendant Russell has not properly been served; and (14) plaintiff's miscellaneous passing references in the complaint do not form a viable cause of action.

Of those fourteen points, defendants' eighth argument, concerning Knight's failure to file a timely notice of claim is their only argument that this Court lacks subject-matter jurisdiction over the complaint. Additionally, defendants have since withdrawn their thirteenth argument, and have acknowledged that Russell was appropriately served.

Knight submitted a sprawling response that meaningfully addressed few of defendants' arguments. Instead, plaintiff seemed to construe defendants' legal arguments to be factual ones and argued that defendants in fact moved for summary judgment. In support of her opposition, plaintiff supplied several exhibits. Because defendants did not move for summary judgment either factually or functionally, plaintiff's exhibits will not be considered. Moreover, those exhibits

improperly include photographs of children, which plaintiff should have censored before submitting, or else filed under seal. Dkt. 13-19; 13-20.

Knight otherwise argues against defendants' grounds for dismissal, and repeatedly requests that, should any of her claims fail, this Court grant her leave to amend them.

### A. PLAINTIFF'S CLAIMS AGAINST THE COUNTY HEALTH DEPARTMENT.

At the outset, defendants argue that Cayuga and the department are not separate entities. Knight agrees and explains that she merely put the department in the case caption to clarify which department of the county she had worked for. Accordingly, all claims against the department must be dismissed with prejudice. *See, e.g., Gray-Davis v. N.Y.,* 2015 WL 2120518, at *6 (N.D.N.Y. May 5, 2015) (dismissing claims against municipal department and police department because proper defendants would be county and city, respectively).

### B. PLAINTIFF'S FIRST AMENDMENT CLAIM.

Section 1983 vested in the people of the United States a cause of action to redress "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by any actor under the color of state authority. 42 U.S.C. § 1983. Among the rights that the people possess, "[t]he Supreme Court has long recognized that the First Amendment affords a degree of protection to public employees to exercise the right of free speech without risk of retaliation by the State employer...." *Lynch v. Ackley,* 811 F.3d 569, 577 (2d Cir. 2016). A plaintiff's rights to petition the government are given the same protections and are analyzed identically. *Bates v. Bigger,* 56 F. App'x 527, 530 (2d Cir. 2002).

Of course, that protection must have certain limits. In particular, a court considering whether a plaintiff's First Amendment rights have been violated "must weigh the employee's speech interests against the government's interest in 'effective and efficient fulfillment of [its] responsibilities to the public, including promoting efficiency and integrity in the discharge of official duties, and maintain[ing] proper discipline in public service.' " *Lynch,* 811 F.3d at 577 (alterations in original) (citing *Lane v. Franks,* 573 U.S. 228, 242 (2014)). Given these considerations, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of

personal interest ... a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers,* 461 U.S. 138, 147 (1983).

**\*5** "The Court determines as a matter of law whether the speech at issue touches a matter of public concern by examining its 'content, form, and context ... as revealed by the whole record.' " *Harris v. Merwin,* 901 F. Supp. 509, 512 (N.D.N.Y. 1995) (alterations in original) (quoting *Connick,* 461 U.S. at 147-48 & n.7). In particular, the court looks to determine whether the speech touched on a "matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane,* 573 U.S. at 241 (2014) (internal citations and quotation marks omitted).

Knight's speech that she alleges triggered retaliation from defendants consisted of her internal claims of workplace violence and defendants' FMLA and HIPAA violations. Dkt. 1, ¶ 77. Defendants argue that this speech touches only upon personal, rather than public, concern. Plaintiff argues that she has protected rights to free speech and to petition these alleged wrongs, and that they are issues of public concern because they were a means of "defending *herself* against retaliation towards *her* disability...." Dkt. 13-22, p. 23 [3] (emphasis added).

Knight's argument is simultaneously conclusory and self-contradictory. That she would be interested in protecting herself is obvious and understandable, but plaintiff in no way establishes that this interest extends beyond her to the public at large. On the contrary, the content of her protected statements involves only her personal frictions with the department; they do not elucidate some larger pattern of the department's assaulting its members or denying them leave. *See Harris,* 901 F. Supp. at 512. Similarly, she spoke in a forum and in a form designed only to reach her superiors in the department, rather than the public, rendering her speech's context and form similarly private. *Id.* In no sense is plaintiff's speech a matter of public concern.

That Knight also relies on the petition clause, rather than only on the free speech clause, is irrelevant because the two clauses are protected under the same analysis. *Bates,* 56 F. App'x at 530 (ruling that plaintiff failed to state claim under petition clause of First Amendment because plaintiff did not demonstrate speech on a matter of public concern). Thus,

plaintiff has not advanced a viable First Amendment claim, and her claim must be dismissed without prejudice.

## C. PLAINTIFF'S FOURTEENTH AMENDMENT CLAIM.

Defendants next ask this Court to dismiss Knight's Fourteenth Amendment procedural due process claim under § 1983. In analyzing plaintiff's claim, there are two threshold questions that must be considered. *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995). The first question is "whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or federal statutes[.]" *Id.* Should plaintiff establish a liberty or property interest, the second question is "what process was due before plaintiff could be deprived of that interest." *Id.*

Construing the complaint liberally, Knight advances four potential property interests: (1) a property interest in her rank and position, *see Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 318 (2d Cir. 2002); (2) a property interest in her rights under the FMLA; (3) a property interest in her rights under the ADA; and (4) a property interest against disclosure of her private medical information under HIPAA.

Regarding her property interest in her rank and position, "where a New York state employee resigns and later contends that [her] resignation was not voluntary, the lack of a hearing prior to the resignation does not deprive the employee of procedural due process because New York has provided an opportunity for a post-deprivation hearing in the form of an Article 78 proceeding." *Dodson v. Bd. of Educ. Of the Valley Stream Union Free Sch. Dist.*, 44 F. Supp. 3d 240, 248 (E.D.N.Y. 2014) (citing *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984)). Moreover, "[a]n Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that [s]he could in a § 1983 suit." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996). Accordingly, even assuming plaintiff did, in fact have a protected property interest in her rank and position, that interest was protected through plaintiff's rights to an Article 78 proceeding. As a result, plaintiff cannot claim a due process violation for her resignation.

**\*6** Similarly, even assuming that Knight possessed a property interest in her rights under the FMLA, ADA, and HIPAA, she cannot claim that she was deprived of her rights to those interests in violation of due process when each statute that she relies on provides its own remedial scheme.

The Fourteenth Amendment is not "a font of tort law to be superimposed upon whatever systems may already be administered," but rather is a mechanism for ensuring the right to what process a plaintiff is due. *Cf. Daniels v. Williams*, 474 U.S. 327, 332 (1986) (denying substantive due process claim for negligent actions of state official).

It would be strange to hold that Knight has been denied due process of law for Cayuga's alleged deprivation of her rights under the ADA and FMLA in a lawsuit brought in part under the power of those statutes. Much as Article 78 forecloses plaintiff's recovery for her termination, she cannot claim that her property interest was deprived without due process while taking advantage of judicial protections and remedies that were created at the same time and by the same mechanism as the rights she claims. *See* 29 U.S.C. §§ 2615, 2617 (rendering it unlawful for any employer to interfere with employee's abilities to exercise their rights under the FMLA and rendering employers liable to suit for violation of the FMLA); 42 U.S.C. §§ 12112, 12117 (declaring it unlawful to discriminate based on disability and establishing enforcement and remedies for discrimination).

HIPAA similarly affords Knight a remedial scheme to redress her purported violation. 42 U.S.C. § 1320d-6 (providing for a fine if a person knowingly discloses protected HIPAA information). Even assuming that these statutes each vest plaintiff with a property interest, she cannot claim that she was deprived of due process of law where processes exist specifically to vindicate those interests after the deprivation, and she is currently employing those same processes.

This Court is not inclined to carve out for Knight a cause of action sounding in due process which is duplicative of her existing causes of action under the FMLA and ADA. Nor is it inclined to divine such a cause of action for HIPAA violations, for which the existence of a private cause of action at all is "doubtful." *Bond v. Conn. Bd. of Nursing*, 622 F. App'x 43, 44 (2d Cir. 2015) (per curiam) (summary order) (collecting cases). Plaintiff has thus failed to adequately plead that she has suffered a due process violation given her post-deprivation remedies under the FMLA, the ADA, and HIPAA. Therefore, her due process claim must be dismissed without prejudice. *Cf. Gentleman v. State Univ. of N.Y.— Stony Brook*, 2016 WL 6892151, at *3 (E.D.N.Y. Nov. 21, 2016) (discussing ADA claim and due process claim without considering whether ADA violation implicated due process); *Dansby v. City of New York*, 2016 WL 9307473, at *4-5 (S.D.N.Y. Aug. 3, 2016) (discussing FMLA retaliation claim

and due process claim without considering whether FMLA retaliation implicated due process).

### D. PLAINTIFF'S EIGHTH AMENDMENT CLAIM.

Knight next argues that defendants violated her rights by exhibiting deliberate indifference to her mental health. The Eighth Amendment protects against deliberate indifference of prisoners' medical needs by prison officials. *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). The Fourteenth Amendment's Due Process Clause also prohibits deliberate indifference to the needs of detainees awaiting criminal trial. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). Plaintiff is neither a prisoner nor a detainee. As such, her attempts to recover under constitutional prohibitions of deliberate indifference are troublingly frivolous. This claim must thus be dismissed with prejudice. [4]

### E. PLAINTIFF'S HIPAA CLAIM.

**\*7** Knight's complaint next asserts a cause of action under HIPAA for Russell's disclosure of her information. Although the Second Circuit has not ruled that there is no private cause of action under HIPAA, it has noted in dicta that it is "doubtful" that one exists, especially given the unanimity with which other circuits have rejected the notion. *Bond*, 622 F. App'x at 44 (collecting cases). Plaintiff, to her credit, acknowledges this fact, and asks this Court to contravene the Second Circuit—and every other circuit court to have addressed the issue—and instead rule that her private HIPAA information should be protected with a cause of action.

In determining whether to infer a cause of action from a statute,

> Congressional intent is the keystone as to whether a federal private right of action exists for a federal statute. Without a showing of congressional intent, a cause of action does not exist and courts may not create one[.] ... [A c]ourt must begin its search for Congress's intent with the text and structure of the statute, and cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided.

*Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007) (internal citations and quotation marks omitted).

When confronted with the question of whether to infer a private right of action under HIPAA, the courts of this Circuit have consistently held that HIPAA "does not confer a private cause of action to any particular class of individuals ... [or,] either explicitly or implicitly, confer to private individuals a right of enforcement." *Bruno v. CSX Transp., Inc.*, 262 F.R.D. 131, 134 n.3 (N.D.N.Y. 2009) (citing *Barnes v. Glennon*, 2006 WL 2811821, at \*5 (N.D.N.Y. Sept. 28, 2006)). This Court agrees with the reasoning of the other courts to have considered the issue. In particular, the existence of an enforcement mechanism within HIPAA itself to be applied by the Secretary of Health and Human Services suggests that there was no intention on Congress's part of supplying the public with a private cause of action. *See Barnes*, 2006 WL 2811821, at \*6. Thus, this Court will not infer a private cause of action under HIPAA, and plaintiff's claims relying on that statute must be dismissed with prejudice.

### F. PLAINTIFF'S FMLA CLAIM.

Defendants raise two defenses against plaintiff's FMLA claims: (1) that at least some of plaintiff's claims are time-barred; and (2) that plaintiff's FMLA claim is not legally cognizable.

### 1. WHETHER PLAINTIFF'S CLAIMS ARE TIME-BARRED.

The statute of limitations for most FMLA claims is two years. *See* 29 U.S.C. § 2617(c)(1) ("[A]n action may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought."). However, a three-year statute of limitations exists for willful FMLA violations. *See id.* § 2617(c)(2).

An alleged FMLA violation is willful if the employer knew or recklessly disregarded whether its conduct violated the FMLA. *See Porter v. N.Y. Univ. Sch. of Law*, 392 F.3d 530, 531-32 (2d Cir. 2004) (per curiam). If, by contrast, the employer acted reasonably, or unreasonably without rising to the level of recklessness, in determining whether it was acting legally, the alleged violations are not willful. *Id.*

Knight argues that defendants' violations of her rights under the FMLA constituted a continuing violation. In calculating when the statute of limitations begins to run in the Title VII

context, the "continuing violation" doctrine considers a claim timely so long as the claim is "timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination[.]" *Patterson v. Cty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004). The Second Circuit has not definitively ruled whether the continuing violation policy extends to FMLA claims. *See Dansby*, 2016 WL 9307473, at *6.

**\*8** However, this Court agrees that "if Congress had intended for a continuing violations exception to apply to the FMLA statute of limitations, 'it would likely have defined the operation of such an extended recovery period with greater detail....' " *Dansby*, 2016 WL 9307473, at *6. The Southern District's logic that Congress could have "endorsed or ratified the preexisting judge-made 'continuing violation' doctrine in Title VII law" but declined to do so is also persuasive. *Id.* (internal citations omitted). Accordingly, this Court joins the Southern district in declining to extend the continuing violations doctrine to the FMLA. *Id.* Any act contrary to the FMLA which was not willful, but that accrued before June 15, 2017, must be dismissed, as must any act constituting willful defiance of the FMLA accruing before June 15, 2016.

## 2. WHETHER PLAINTIFF ADEQUATELY PLEADED FMLA INTERFERENCE.

Knight is unclear as to what precisely her claims under the FMLA are. Instead, she broadly alleges that defendants violated her FMLA rights. In attempting to construe her claims, this Court notes that plaintiffs can sue under the FMLA at least for interference or retaliation.

To succeed on a claim for interference with FMLA rights, a plaintiff must establish: (1) that she is an eligible employee under the FMLA; (2) that the defendant is an employer within the meaning of the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied benefits to which the FMLA entitled her. *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).

Knight makes at least two allegations sounding in FMLA interference. She alleges that Cuddy placed her on time abuse and would not count time she was taking off as FMLA leave. Dkt. 1, ¶ 31. She also alleges that Purdy and Cuddy together conspired to deny her FMLA leave on May 17, 2018, when plaintiff suffered a panic attack at the prospect of needing to move back near Ryan. *Id.* ¶ 38. Defendants' arguments in favor of dismissal of plaintiff's FMLA claims rely puzzlingly

on the assertion that plaintiff has not alleged that she was denied any FMLA leave. That assertion is simply false.

Moreover, these events occurred in October of 2017 and May of 2018, respectively, and are thus within the FMLA's statute of limitations, regardless of whether defendants acted willfully. *Id.* ¶¶ 31, 38. Because defendants have raised no other arguments in favor of dismissing plaintiff's FMLA claims that sound in interference, the claim survives defendants' Rule 12(b)(6) motion. However, plaintiff's allegations concerning Cuddy's withholding her re-certification materials from 2013-2017 and for the improper designation of her vacation time for cosmetic surgery as FMLA leave do not qualify as interference unless plaintiff can demonstrate that these actions in fact resulted in her being denied FMLA leave. Dkt. 1, ¶¶ 29, 54.

## 3. WHETHER PLAINTIFF ADEQUATELY PLEADED FMLA RETALIATION.

Additionally, Knight makes several claims that could sound in FMLA retaliation. To establish an FMLA retaliation claim sufficient to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must show: (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).

Defendants do not dispute that Knight exercised her FMLA rights. Nor do they argue that she was not qualified for her position. Instead, their arguments against this Court's finding retaliation center on whether plaintiff suffered a cognizable adverse employment action.

**\*9** An action is "adverse" for the purposes of FMLA retaliation if the action "is likely to dissuade a reasonable worker in the plaintiff's position from exercising [her] legal rights." *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). Adverse actions include constructive discharge. *See Connolly v. Equity Servs., Inc.*, 756 F. App'x 83, 84 & n.1 (2d Cir. 2019).[5] A constructive discharge occurs where the employer intends "to create an intolerable environment" and that in so doing they create "work conditions so intolerable that [a reasonable person] would have felt compelled to resign." *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 308 (2d Cir. 2017). As the "reasonable person" language suggests, the constructive discharge test is objective. *Munday*

*v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 241 (2d Cir. 2013) (finding no constructive discharge where plaintiff went on job-stress-related disability leave). All told, constructive discharge presents a "high standard." *Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014) (summary order).

For the purposes of a motion to dismiss, Knight has met the high standard of constructive discharge. *Adams*, 560 F. App'x at 49. Although plaintiff clearly had a severe reaction to being forced to move near Ryan, being forced to have an office located near a disliked or even hated coworker would not compel a reasonable person to resign. Dkt. 1, ¶¶ 43, 46. However, when combined with plaintiff's allegations of continued slights from her coworkers—and especially the December 20, 2018 Notice of Disciplinary Action—she could, potentially, marshal sufficient evidence to plausibly suggest constructive discharge. *Id.* ¶¶ 17-20, 58.

In fact, the investigation stemming from the Notice of Disciplinary Action alone can constitute an adverse employment action if Knight's employer intended it to constructively discharge plaintiff. *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 147 (2d Cir. 2014) ("[A]n employer's investigation may constitute a cognizable retaliatory action if carried out so as to result in a hostile work environment, constructive discharge, or other employment consequences of a negative nature[.]"). Assuming the facts of the complaint to be true, the Notice of Disciplinary Action concerned a non-issue that plaintiff had already attempted to resolve by notifying Cuddy, and Cuddy had simply ignored her. Dkt. 1, ¶ 59. Under those circumstances, it is plausible that Cuddy and the department intended to create an unbearable work environment for plaintiff by filing the notice. As such, plaintiff has successfully established adverse employment actions in the form of both her constructive discharge and her investigation stemming from the Notice of Disciplinary Action. However, these are the only two acts identified by plaintiff that are adverse.

Lastly, Knight has sufficiently—albeit barely—met her burden of establishing an inference of retaliatory intent. The Second Circuit has ruled that a mere temporal gap of "five months might be enough to establish a prima facie case" of retaliation, thus those five months might also be enough to survive defendants' motion to dismiss. *Cf. Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (noting in Title VII context that temporal proximity could support prima facie case for retaliation).

Knight's last use of FMLA time occurred in June of 2018, five months before the Notice of Disciplinary Action, which could plausibly constitute both an adverse employment action in itself and the signal of a sufficiently hostile work environment to constructively discharge her. Accordingly, in deference to plaintiff's lack of discovery and other means of obtaining evidence of a retaliatory motive on defendants' part at this juncture, plaintiff has established a sufficient inference of a retaliatory motive to survive defendants' motion to dismiss. Plaintiff's potential claims of FMLA retaliation thus must proceed. *See Abrams*, 764 F.3d at 254 (ruling that five-month gap between protected activity and adverse action "might" establish prima facie case of retaliation).

**\*10** As relevant to both of Knight's potential FMLA claims, defendants also argue that the individual defendants do not qualify as employers and cannot be individually liable under the FMLA. "[I]ndividual public employees may be amenable to suit under the FMLA if they qualify as an employer under 29 U.S.C. § 2611(4)(A)(ii)(I) such that they had 'substantial control over the aspect of employment alleged to have been violated[.]' " *Clark v. Dominique*, 798 F Supp. 2d 390, 406 (N.D.N.Y. 2011) (dismissing FMLA claims against individual defendants where plaintiff has failed to allege "any particularized or individualized" facts establishing that defendants had substantial control over FMLA claims). In other words, courts must ask "whether the alleged employer possessed the power to control the worker [ ] in question, with an eye to the 'economic reality' presented by the facts of each case." *Graziadio*, 817 F.3d at 422 (internal citations and quotation marks omitted).

The factors relevant to determining whether an individual employee qualifies as an employer include whether the alleged employer: "(1) had the power to hire and fire the employees[;] (2) supervised and controlled employee work schedules or conditions of employment[;] (3) determined the rate and method of payment[;] and (4) maintained employment records." *Graziadio*, 817 F.3d at 422.

Although the complaint's allegations regarding Knight's relationship to each of the individual defendants are sparse to say the least, she has sufficiently pled that both Cuddy and Purdy qualify as employers. She has alleged that Cuddy is a director and her supervisor. Dkt. 1, ¶ 59. She has also alleged that Purdy had control over whether she received FMLA time and generally supervised her. *Id.* ¶¶ 31, 38. [6]

However, the only allegations in the complaint concerning Russell include that he is a human resources employee and that he disclosed Knight's HIPAA and leave information inappropriately. Dkt. 1, ¶¶ 33, 57. These allegations are insufficient to establish that he had control over plaintiff's FMLA leave such that he constituted an employer. As a result, plaintiff's FMLA claims against Russell in his individual capacity must be dismissed without prejudice, subject to plaintiff's bolstering her claims of his status as an employer.

#### G. PLAINTIFF'S ADA CLAIM.

Much like her claims of FMLA retaliation, Knight has brought claims under the ADA in broad strokes, without specifically identifying the nature of the claims that she brings. There are, however, at least two types of claim rooted in the ADA: (1) discrimination; and (2) retaliation.

##### 1. THE INDIVIDUAL DEFENDANTS.

To the extent that defendants argue that Knight's ADA claims against the individual defendants in their personal capacities must be dismissed, they are correct. Although the Second Circuit has not expressly ruled that there is no available remedy under the ADA against individual defendants, the district courts of this circuit—including this one—have overwhelmingly done so. *See, e.g., Frantti v. N.Y.*, 2017 WL 922062, at *5 (N.D.N.Y. Mar. 8, 2017); *Dominelli v. N. Country Acad.*, 2016 WL 616375, at *7 (N.D.N.Y. Feb. 16, 2016); *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 343 (E.D.N.Y. 2014).

This Court maintains its agreement with the reasoning that supported those decisions, namely that "the ADA's statutory language is concerned with the alleged (mis)conduct of an entity—that is, an employer—covered by its various provisions." *Frantti*, 2017 WL 922062, at *5. Because the language of the statute focuses on the employer, rather than on individuals, this Court will not extend it to reach individual liability. Thus, to the extent that plaintiff asserts claims under the ADA against defendants in their individual capacities, those claims must be dismissed with prejudice.

##### 2. ADA DISCRIMINATION.

 **\*11**  To state a plausible claim of discrimination under the ADA, a plaintiff must allege that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions

of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [her] disability or perceived disability." *Caskey v. Cty. of Ontario*, 560 F. App'x 57, 58 (2d Cir. 2014) (summary order) (alterations in original) (citing *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005)).

A plaintiff is disabled within the meaning of the ADA if she: (1) suffers from a physical or mental impairment; and (2) that impairment substantially limits a major life activity upon which the plaintiff relies. *See Potter v. Xerox Corp.*, 1 F. App'x 34, 37 (2d Cir. 2001).

Defendants first argue that Knight has failed to establish that she is a member of a protected class because she has only made vague references to a "mental health condition." Defendants are wrong; the complaint makes numerous references to plaintiff's condition of anxiety and post-traumatic stress disorder, which result in plaintiff's panic attacks. Dkt. 1, ¶¶ 23, 104, 113, 139, 143.

Nevertheless, Knight has not established that she is disabled within the meaning of the ADA. Many courts in the Second Circuit have confronted similar facts of plaintiffs suffering from anxiety and panic attacks related to their working conditions, and they have unanimously rejected the notion that these symptoms amount to disability that substantially limits plaintiffs' major life activities. *See, e.g., Davitt v. Rockland Cty. Dep't of Mental Health*, 2013 WL 1091982, at *6-7 (S.D.N.Y. Mar. 15, 2013) (collecting cases and ruling that anxiety and depression did not constitute disability because it only interfered with ability to work in one role); *see also Price v. Mount Sinai Hosp.*, 458 F. App'x 49, 51-52 (2d Cir. 2012) (upholding dismissal because plaintiff had not established disability where workplace stress and depression did not disqualify her from a broad range of jobs).

Knight has not provided any allegations in the complaint that demonstrate that she is disabled within the meaning of the ADA. Her proposed disabilities of anxiety, post-traumatic stress disorder, and panic attacks are limited to her work environment. Every panic attack that she allegedly suffered was precipitated by friction caused by her relationships with her fellow department employees. Dkt. 1, ¶¶ 23, 35-36, 42. She also specifically identifies her work environment and divorce as the causes of her alleged disability. *Id.* ¶ 25.

Presumably, Knight could still work in an environment that did not provide these stressors, and she has not pled the

existence of any other major life activity that her condition impedes. Accordingly, to the extent she makes one, plaintiff's claim of ADA discrimination must be dismissed without prejudice. *See Potter*, 1 F. App'x at 36-37 (upholding grant of summary judgment for defendant where plaintiff only demonstrated that working with single supervisor caused depression, anxiety, and panic attacks, and plaintiff failed to muster any further allegations of interference with major life activities).

### 3. ADA RETALIATION.

To state a claim for ADA retaliation, a plaintiff must allege that: "(1) [s]he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took an adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). Nowhere in the complaint does Knight allege that she engaged in any activity protected by the ADA. As such, plaintiff has not sufficiently pled an ADA retaliation claim to survive defendants' motion to dismiss. Thus, all of plaintiff's ADA claims against Cayuga must be dismissed without prejudice.

### H. TIMELY NOTICE OF CLAIM AS TO PLAINTIFF'S STATE LAW CLAIMS.

**\*12** A person pursuing a claim against a New York county or its employees in their official capacities must comply with the notice of claim requirements of N.Y. GEN. MUN. LAW § 50-e. N.Y. COUNTY LAW § 52.1. Under § 50-e.1(a), the plaintiff must serve the municipal defendants with a valid notice of claim within ninety days after the claim arises. N.Y. GEN. MUN. LAW § 50-e. Without having served a timely notice of claim, no court has subject-matter jurisdiction over that claim. *See Dingle v. City of New York*, 728 F. Supp. 2d 332, 348-349 (S.D.N.Y. 2010) ("Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement[.]").

However, a plaintiff can apply to a court for permission to serve a late notice of claim. N.Y. GEN. MUN. LAW § 50-e.5. Such applications must "be made to the supreme court or to the county court[.]" N.Y. GEN. MUN. LAW § 50-e.7. In construing this statute, the Second Circuit has not expressly ruled that district courts have jurisdiction over requests to provide late notice. *See Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 540 (2d Cir. 1999). That said, most district courts

in the Second Circuit have determined that they do not have such jurisdiction. *See, e.g.*, *Dodson*, 44 F Supp. 3d at 250.

In determining whether to grant an extension of the time to serve a notice of claim, courts should consider, among other things: (1) whether the county acquired actual knowledge of the essential facts constituting the claim within the time specified; (2) whether the claimant was an infant, or mentally or physically incapacitated including by death; (3) whether the claimant justifiably relied on the county's settlement representations; (4) whether the claimant made an excusable error as to the identity of the county; (5) whether the delay was caused by technical failures; and (6) whether the delay substantially prejudiced the public corporation in maintaining its defense. N.Y. GEN. MUN. LAW § 50-e.5.

However, where claims are filed against county employees in their individual capacities, "service of a notice of claim is not a condition precedent to the commencement of an action against a county's employees or agents unless the county is required to indemnify the individual defendants." *Seale v. Madison Cty.*, 929 F Supp. 2d 51, 72 (N.D.N.Y. 2013). Whether the employees are entitled to indemnity turns on whether they were acting within the scope of their employment—in which case indemnification is necessary and plaintiffs must comply with § 50-e—or whether they were acting outside the scope of their employment—such as through the commission of an intentional tort—in which case the plaintiff need not follow § 50-e's procedures. *Id.*

To the extent Knight asserts claims arising under state law against Cayuga prior to July 28, 2018, those claims must be dismissed for a lack of subject-matter jurisdiction. Dkt. 5-2, p. 11 (plaintiff's first notice of claim dated October 24, 2018). This Court agrees with the other courts of this Circuit that it does not have the jurisdiction to grant plaintiff leave to file a late notice of claim. Section 50-e explicitly states that "[a]ll applications" for a late notice of claim "*shall* be made to the supreme court or to the county court[.]" N.Y. GEN. MUN. LAW § 50-e.7 (emphasis added). In the face of a firm statutory mandate, this Court will not overrule the apparent intent of the State of New York. Thus, plaintiff's claims sounding in state law against the county occurring prior to July 28, 2018 must be dismissed without prejudice.

**\*13** In any event, even if this Court did have jurisdiction to grant Knight leave to file a late notice of claim, it would not do so. Of the factors identified in § 50-e, plaintiff could not easily point to any that cut in her favor. It is possible that Cayuga

had some notice of the essential facts that produced some of her claims through her internal complaints, but it could not possibly have received notice of each of the varied allegations that she asserts. *See* Dkt. 1, ¶¶ 20, 53 (plaintiff's allegations of filing complaints for a hostile work environment and Cuddy's assault and battery, respectively). Additionally, it is unlikely that the county can point to much in the way of prejudice resulting from the delay in notice. However, in no other way is plaintiff's lateness excused, and those two grounds, without more, are insufficient. Thus, even if this Court could grant plaintiff the right to file a late notice of claim, it would decline to do so.

Several of Knight's claims, however, are intentional tort claims against her coworkers in their official and personal capacities. Specifically, plaintiff alleges against Purdy false imprisonment, assault, and battery, and against all individual defendants intentional infliction of emotional distress. Defendants point to N.Y. PUB. OFF. LAW § 18.4 to establish that Cayuga would indemnify them, but that statute expressly notes that the county will not indemnify injuries resulting from "intentional wrongdoing." *Id.* § 18.4(b). The individual defendants thus are not entitled to indemnity by the county for their intentional torts. *See, e.g., Lluberes v. City of Troy,* 2014 WL 1123413, at *21 (N.D.N.Y. Mar. 21, 2014) (ruling that notice of claim requirements do not apply to assault and battery claims against individual defendants); *Williams v. Cablevision Sys. Corp.,* 2000 WL 218403, at *4 (S.D.N.Y. Feb. 24, 2000) (ruling that notice of claim requirements do not apply to false arrest and false imprisonment claims against individuals); *cf. Jean-Laurent v. Hennessy,* 840 F. Supp. 2d 529, 559-60 (E.D.N.Y. 2011) (ruling that intentional infliction of emotional distress was violative of rules and regulations and thus city of New York special notice requirements do not apply).

## I. PLAINTIFF'S FALSE IMPRISONMENT CLAIM.

To prove false imprisonment under New York law, a plaintiff must prove: "(1) the defendant intended to confine [the plaintiff;] (2) the plaintiff was conscious of the confinement[;] (3) the plaintiff did not consent to the confinement[;] and (4) the confinement was not otherwise privileged." *McGowan v. United States,* 825 F.3d 118, 126 (2d Cir. 2016) (alterations in original).

Knight alleges that Purdy falsely imprisoned her on June 21, 2018, by blocking her in her office despite her multiple requests to leave. Dkt. 1, ¶ 43. That plaintiff asked to leave but was denied satisfies each of the first three elements, because

the request demonstrates that plaintiff did not consent to being confined, and the denial establishes both that Cuddy intended to confine her and that plaintiff was aware of that intent. *McGowan,* 825 F.3d at 126. Defendants have not identified any privilege that would have allowed this defendant to confine her, and this Court is aware of none. Thus, plaintiff has plausibly alleged that this defendant falsely imprisoned her, and her false imprisonment claim must survive.

## J. PLAINTIFF'S ASSAULT AND BATTERY CLAIM.

Under New York law, "[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact with another person without consent." *Girden v. Sandals Int'l,* 262 F.3d 195, 203 (2d Cir. 2001).

Knight alleges that Purdy twice grabbed her arms hard enough to cause bruising on June 21, 2018. Dkt. 1, ¶ 44. Plaintiff twice asked to be released, but this defendant refused. *Id.* Plaintiff has therefore successfully pleaded that this defendant battered her. Presumably, given the context of plaintiff's panic attacks and attempts to escape from this defendant's office, and the fact that this defendant grabbed her twice, she was also aware of—and in fear of—the imminent harmful contact. *Id.* Thus, although the complaint does not state with complete clarity that she feared that this defendant was trying to grab her with enough force to cause bruises, plaintiff's claim of assault and battery must survive.

## K. PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM.

**\*14** Proving a claim of intentional infliction of emotional distress requires: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Conboy v. AT&T Corp.,* 241 F.3d 242, 258 (2d Cir. 2001). Regarding the first element, the conduct must be "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Tebbenhoff v. Elec. Data Sys. Corp.,* 244 F. App'x 382, 384 (2d Cir. 2007).

The standard for presenting a valid claim of intentional infliction of emotional distress is "rigorous, and difficult to satisfy." *Conboy,* 241 F.3d at 258 (citing *Howell v. N.Y. Post*

*Co.*, 612 N.E.2d 699, 702 (N.Y. 1993) (citation omitted)). So rigorous is this standard that "[i]n the rare instances where the New York courts have found the complaint sufficient to state a claim for intentional infliction of emotional distress in the employment context, the claims have been accompanied by allegations of sex discrimination, and more significantly, [sexual] battery." *Gerzog v. London Fog Corp.*, 907 F. Supp. 590, 604 (E.D.N.Y. 1995) (collecting cases). As a result, "federal courts applying New York law regularly dismiss claims for intentional infliction of emotional distress." *Hendricks v. Cty. of Oneida*, 2013 WL 4106488, at *15 (N.D.N.Y. Aug. 13, 2013).

Regarding Cayuga, defendants also correctly assert that "public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity...." *Crvelin v. Bd. of Educ. of City Sch. Dist.*, 43 N.Y.S.3d 614, 614 (App. Div. 4th Dep't 2016). Thus, to the extent that Knight asserts intentional infliction of emotional distress against Cayuga as a whole, that claim must be dismissed with prejudice.

As to the individual defendants, Knight has not made any allegations amounting to extreme or outrageous conduct. The closest she comes is Cuddy's alleged assault, battery, and false imprisonment, but even this event fails to carry plaintiff through defendants' Rule 12(b)(6) motion for two separate reasons. Dkt. 1, ¶ 44. First, plaintiff does not allege that there was any sexual dimension to any of the complained conduct. Therefore, her complaint falls far short of the standard imposed on extreme and outrageous conduct by New York courts. *See Gerzog*, 907 F. Supp. at 604.

Alternatively, as defendants correctly note, "the New York Court of Appeals has ... cautioned that a claim for [intentional infliction of emotional distress] may not be sustainable 'where the conduct complained of falls well within the ambit of other traditional tort liability.' " *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 159 (2d Cir. 2014) (citing *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (N.Y. 1978)). Because plaintiff's only allegations that even approach extreme and outrageous conduct are cognizable as assault and battery, these claims merit dismissal for this alternative reason as well. Therefore, her claims of intentional infliction of emotional distress against the individual defendants must also be dismissed without prejudice.

### L. PLAINTIFF'S WHISTLEBLOWER CLAIMS.

Knight's eighth claim alleges that she was harassed and retaliated against for being a "whistleblower." Dkt. 1, ¶

134. But nowhere does plaintiff assert what whistleblower protections she relies on. Instead, she states in conclusory fashion that she is "suppose[d] to be protected by HIPAA, FMLA[,] and the ADA." *Id.* To the extent that plaintiff is claiming violations of these statutes, defendants correctly point out that those claims are duplicative of her other claims and must be dismissed.

**\*15** Knight's response in her cross-motion only further confuses the issue by making passing references to state law, Title VII, 42 U.S.C. § 1981, and the First Amendment. She seems mostly to rely on the First Amendment as her source of protection, in which case that claim must again be dismissed as duplicative and meritless. Should she wish to maintain this claim, she must present a lucid legal theory of recovery. Until then, the complete lack of clarity as to this claim demands that it be dismissed without prejudice.

### M. PLAINTIFF'S NEGLIGENCE CLAIMS.

Knight next asserts claims of general negligence against defendants, alleging that they exacerbated her anxiety and post-traumatic stress disorder through their negligent treatment of her. She also alleges negligent infliction of emotional distress. However, New York's Workers' Compensation Law provides that "[t]he right to compensation or benefits under this chapter, shall be the exclusive remedy to an employee ... when such employee is injured or killed by the negligence or wrong of another in the same employ[.]" N.Y. WORKERS' COMP. LAW § 29.6. As such, New York's workers' compensation law "can and does bar state common law negligence claims." *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997).

Knight's claims of common law negligence and negligent infliction of emotional distress for any act arising on or after July 28, 2018 must therefore be dismissed with prejudice. *See, e.g.*, *Lowe v. Housing Works, Inc.*, 2013 WL 2248757, at *12 (S.D.N.Y. May 15, 2013) (ruling that exclusive remedy provision of workers' compensation precluded recovery for negligent infliction of emotional distress).

### N. PLAINTIFF'S MISCELLANEOUS POTENTIAL CLAIMS.

Knight also makes passing references in her complaint to libel, slander, equal protection, and negligent hiring, training, and supervision. This Court would be more sympathetic to her shotgun spread of potential claims were she proceeding *pro se*. She is, however, counselled. Her failure to present

clean, clear claims—complete with citations to the proper foundational law and organized in such a way as to make her arguments cognizable—is as a result much harder to swallow.

That Knight did not actually defend these claims from defendants' arguments, and instead simply asked to be allowed to amend them, only makes matters worse. Had plaintiff appropriately followed the local rules of this District and submitted a proposed amended complaint, this Court would be able to address any proposed support for these claims and to determine whether amending these claims would be futile. She failed to do so and should not be permitted to benefit from flaunting the rules. To whatever extent plaintiff has asserted claims sounding in libel, slander, equal protection, and negligent hiring, retention, or training, those claims are dismissed without prejudice.

### O. DEFENDANTS' MOTION TO STRIKE.

Defendants have also moved under Rule 12(f) to strike certain paragraphs of Knight's complaint alleging that Cuddy engaged in an extramarital affair. A court "may strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." Rule 12(f). "A motion to strike is not favored and will not be granted unless it is clear that the allegation in question can have no possible bearing on the subject matter of the litigation." *Ruggles v. Wellpoint, Inc.*, 253 F.R.D. 61, 65 (N.D.N.Y. 2008) (internal citations and quotation marks omitted).

Indeed, "[i]t is settled in this Circuit that [such a] motion will be denied unless it can be shown that no evidence in support of the allegation would be admissible." *Kehr ex rel. Kehr v. Yamaha Motor Corp.*, 596 F. Supp. 2d 821, 829 (S.D.N.Y. 2008) (internal quotation marks and citations omitted). "Thus the courts should not tamper with the pleadings unless there is a strong reason for doing so." *McNeil v. Corr. Med. Care, Inc.*, 2019 WL 4415528, at *4 (N.D.N.Y. Sept. 16, 2019) (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)).

**\*16** This Court is not unsympathetic to defendants' arguments that these allegations of an alternative motive for Cuddy to target Knight may in fact weaken her retaliation claims by showing a cause for this defendant's adverse employment actions other than her application for FMLA leave. Ultimately, however, the strong prohibitions against tampering with the pleadings compel the denial of defendants' motion, especially considering that plaintiff's relationship with all her coworkers and the hostility of that

relationship will be relevant to determining whether she was constructively discharged. *Cf. Crespo v. New York City Transit Auth.*, 2002 WL 398805, at *11-12 (E.D.N.Y. Jan. 7, 2002) (ruling against motion to strike where alleged sexual harassment contributed to determination of hostile work environment).

### P. PLAINTIFF'S MOTION FOR LEAVE TO AMEND.

Knight has also moved for leave to amend her complaint under Rule 15(a)(2). Under that Rule, a party cannot amend its complaint without the court's leave. Rule 15(a)(2). The court should, however, "freely give leave when justice so requires." *Id.* "Mere delay, ... absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (internal citation omitted).

Defendants correctly note that Knight's cross-motion fails to comply with Local Rules 7.1(a)(4)—for failing to provide a proposed amended complaint with a motion to amend—and 7.1(c)—because plaintiff did not properly label her motion as a cross-motion and exceeded the twenty-five-page maximum page limit for cross-motions.

Additionally, plaintiff used her lack of a proposed amended complaint as a shield against defendants' varied arguments in favor of dismissal. Instead of defending the viability of her claims, she repeatedly relied on her willingness to amend the complaint to carry her through defendants' motion to dismiss. But worst of all, plaintiff included with her submissions unredacted photographs of children. These failings together skirt dangerously close to bad faith and undue prejudice. *See Ruotolo*, 514 F.3d at 191.

Yet despite all these failings, Knight has nevertheless presented cognizable claims. Those claims, though unclear, are still viable. Additionally, some of plaintiff's claims could be resuscitated should she amend her pleadings. But if that is to happen, plaintiff must be permitted to prune, support, and clarify the complaint as it stands. Additionally, the Second Circuit has been clear that it is error to grant a motion to dismiss while denying a plaintiff leave to amend, even where the plaintiff failed to submit a proposed amended complaint. *See Cresci v. Mohawk Valley Comm. College*, 693 F. App'x 21, 24-25 (2d Cir. 2017) (summary order) (ruling that district court's simultaneous grant of dismissal of complaint and denial of leave to amend because plaintiff failed to submit proposed amended complaint was error).

For these reasons, Knight must be granted leave to amend her complaint, despite the glaring insufficiencies of her cross-motion. She may amend her complaint to: (1) identify any expressions of protected public speech; (2) identify any property interests to which defendants denied her procedural due process; (3) clarify whether she seeks relief for FMLA interference, retaliation, or both, and if she claims interference whether she was actually denied FMLA leave because of the improper designation of her time off for surgery as FMLA time or for Cuddy's withholding her re-certification papers; (4) establish a clearer causal connection between her FMLA leave and the retaliatory acts that she alleges; (5) clarify whether and to what extent defendants Purdy, Cuddy, and Russell controlled her employment and qualified as employers; (6) demonstrate disruption in any major life activity by her anxiety, post-traumatic stress disorder, and panic attacks; (7) identify any activities she conducted which were protected by the ADA; (8) clarify if and how Purdy subjected her to apprehension of an imminent assault during the alleged June 21 battery; (9) allege any facts that could constitute extreme and outrageous conduct for the purposes of intentional infliction of emotional distress; (10) clarify what law plaintiff relies on as a "whistleblower"; and (11) provide concrete, discrete claims of libel, slander, violations of her right to equal protection, and negligent hiring, training, and supervision.

## V. CONCLUSION

**\*17** Defendants have successfully identified fatal flaws in several of Knight's claims, but not all. Plaintiff's claims under the FMLA and her alleged intentional torts of false imprisonment and assault and battery under New York common law are cognizable and legally sufficient to survive defendants' motion under Rule 12(b)(6). However, even these claims are nevertheless muddled and in desperate need of greater clarity for this complaint to move forward. Plaintiff will be permitted to provide that clarity. She is cautioned, however, not to take this Court's forbearance too far. Plaintiff should pay close attention to the rules of this district and the orders of this Court. She—and her counsel—will be expected to comply with both in the future.

Therefore, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part and DENIED in part;

2. Plaintiff's cross-motion to amend is GRANTED in part and DENIED in part;

3. Plaintiff's claims against the Cayuga County Health Department, her Eighth Amendment claims, her HIPAA claims, her ADA claims against the individual defendants, her claims of intentional infliction of emotional distress against the County of Cayuga occurring on or after July 28, 2018, and her claims of negligence and negligent infliction of emotional distress occurring on or after July 28, 2018 are DISMISSED WITH PREJUDICE;

4. Plaintiff's claims of negligence and negligent infliction of emotional distress occurring before July 28, 2018 are DISMISSED WITHOUT PREJUDICE due to this Court's lack of subject matter jurisdiction;

5. Plaintiff's claims of First Amendment retaliation, Fourteenth Amendment Due Process violations, her ADA claims against the County of Cayuga, her FMLA claim as to defendant Michael Russell, her intentional infliction of emotional distress claim against the individual defendants, her complaints of retaliation as a whistleblower, and her claims of libel, slander, equal protection, and negligent hiring, training, and supervision, are DISMISSED WITHOUT PREJUDICE for failure to state a claim;

6. Plaintiff may amend her complaint to: (1) clarify her remaining claims under the FMLA against the County of Cayuga, Nancy Purdy, and Kathleen Cuddy, as well as her false imprisonment and assault and battery claims against Purdy; and (2) to address the deficiencies identified by this Opinion in the claims dismissed without prejudice for failure to state a claim;

7. Plaintiff may submit an amended complaint no later than 12:00 p.m. on November 8, 2019; and

8. Defendants' motion to strike under Rule 12(f) is DENIED.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 5067901

Footnotes

1    The facts are taken from plaintiff's complaint, and its allegations are assumed to be true for the purposes of a Rule 12(b)(6) motion. *Weshnak v. Bank of Am., N.A.*, 451 F. App'x 61, 61 (2d Cir. 2012).

2    Defendants' subject-matter jurisdiction arguments are limited only to plaintiff's state law claims. As such, this Court will nevertheless begin by addressing the sufficiency of plaintiff's federal law claims.

3    Pagination corresponds with CM/ECF.

4    Because plaintiff has failed to state any cognizable § 1983 claim, her derivative *Monell* claim must also be dismissed without prejudice as to her First and Fourteenth Amendment claims, but with prejudice with respect to her Eighth Amendment claim. *Pinter v. City of New York*, 448 F. App'x 99, 106 (2d Cir. 2011) (dismissing derivative *Monell* claims where underlying § 1983 claims against individual were dismissed).

5    Courts apply the same standard for evaluating Title VII and FMLA constructive discharge claims. *Connolly*, 756 F App'x at 84 n.1.

6    Plaintiff also alleges that Purdy occupied the role of Director of Community Health. Dkt. 1, ¶ 31. Whether this is contradictory or whether she and Cuddy occupied different roles involving the title of director is unclear from the complaint itself. This Court must construe the complaint in plaintiff's favor, however.

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 701918
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marcel BIBEAU, Plaintiff,
v.
Dr. Laura SODEN, Ph.D., Dr. Samual Bastien,
VI, Ph.D., Joette Holgado, Defendants.

No. 8:08–CV–0671 (LEK/RFT).
|
March 13, 2009.

West KeySummary

**1**  **Conspiracy**
 Pleading

An inmate failed to establish a § 1983 conspiracy cause of action where the inmate did not state a constitutional violation within his complaint and did not plead any facts that established that there was an agreement between a prison official and a mental health physician, what the agreement may have been, that they acted in concert to injure the inmate, or made any overt act in furtherance of the conspiracy. 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Marcel Bibeau, Malone, NY, pro se.

Senta B. Siuda, Office of Attorney General, Syracuse, NY, for Defendants.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

**\*1**  This matter comes before the Court following a Report–Recommendation filed on February 2, 2009 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report–Rec. (Dkt. No. 20). After ten days

from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Bibeau, which were filed on February 12, 2009. Objections (Dkt. No. 21).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report–Recommendation should be approved for the reasons stated therein.

The Court also notes that in the Objections, Plaintiff requests "a chance to submit a 'Amended Complaint' [sic]." Dkt. No. 21. Although Fed.R.Civ.P. 15(a) provides that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served," where as here, a responsive pleading has been served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party ..." Leave to amend should be denied in the case of delay, bad faith, futility, or prejudice to the non-moving party. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 604–05 (2d Cir.2005). Leave to amend may be denied as futile "where the claim or defense proposed to be added has 'no colorable merit' ". *Oliver v. Demarinis & Co .,* 90 Civ. 7950(SS), 1993 WL 33421 at *5 (S.D.N.Y. Jan. 29, 1993) (citation omitted); *see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 783 (2d Cir.1984).

Plaintiff has not included a proposed amended complaint, and has not indicated what effect any amended complaint would have on the alternative bases for dismissal, as set forth in the Report–Recommendation. To the extent that the arguments put forth by Plaintiff in his Objections may be construed as the basis on which he now seeks to amend his complaint, the Court has considered those arguments and finds that the addition to an amended complaint of allegations involving those arguments would not be sufficient to overcome a motion to dismiss. Therefore, leave to amend the Complaint based on those arguments is denied as futile.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 20) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion to dismiss (Dkt. No. 14) is **GRANTED;** and it is further

**\*2 ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION and ORDER* [1]

RANDOLPH F. TREECE, United States Magistrate Judge.

On June 25, 2008, *Pro se* Plaintiff, Marcel Bibeau, filed a redacted Complaint, pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated. Dkt. No. 1. On September 12, 2008, Defendants filed a Motion to Dismiss, pursuant to FED. R. CIV. P. 12(b)(6). Dkt. No. 14. Bibeau opposes the Motion to Dismiss. Dkt. No. 16, Pl.'s Mem. of Law with Exs. Defendants served a Reply to Bibeau's Opposition. Dkt. No. 17, Senta Siuda, Esq., Affirm., dated Oct. 24, 2008. For the reasons that follow, we recommend that Defendants' Motion to Dismiss be **granted.**

### I. COMPLAINT

For the purpose of deciding this Motion to Dismiss, the Court will accept as true the allegations set forth in the Complaint and the attachments.

Bibeau is an inmate who has been in the custody of New York State Department of Correctional Services (DOCS) since 1996. He is also the father of S.B. and was married to Ann Bibeau Moschos. Prior to becoming a ward of DOCS, Bibeau was incarcerated at the Clinton County Jail. While housed at the Clinton County Jail, he sought mental health and substance abuse assistance. Dr. Soden, who worked for Clinton County Mental Health, examined and counseled him on his emotional and substance abuse problems. Compl., at pp. 2 & 3.[2] Bibeau complains that those interviews were supposed to be confidential pursuant to the Health Insurance

Portability and Accountability Act of 1996 (HIPPA), Pub.L. No. 104–191, 110 Stat.1936 (1996) but were subsequently and illegally revealed by Soden. *Id.* at p. 10.

In 2004, while still incarcerated, Bibeau sought visitation rights with his daughter and filed a petition with the Essex County Family Court, the Honorable Andrew Halloran, Family Court Justice, presiding. *Id.* at ex. 11. Ann Bibeau– Moschos opposed Bibeau's effort to visit with his minor daughter. On or about November 8, 2004, Justice Halloran directed Dr. Soden to conduct an evaluation of S.B. and to submit an evaluation. *Id.* at p. 3. Based upon information and belief, Bibeau claims that Soden did more than interview the child but also spoke with Bibeau–Moschos, whom he claims made false statements about him. Those false statements and Soden's opinions were contained in the evaluation with the recommendation that Bibeau be denied visitation with S.B. *Id.* at p. 4. Further, Bibeau alleges that when Soden interviewed Bibeau–Moschos, she shared, in sum and substance, confidential communications she had with him in 1996, all without his approval. *Id.* Lastly, Soden did not interview Bibeau. Bibeau complains that Soden generated false information and submitted a false evaluation, containing unsolicited lies, faulty opinions, and the improper dissemination of his confidential consultations, in order to prevent him from visiting with his daughter." *Id.* at pp. 5–7.

**\*3** Because of this negative evaluation, he was "coerced ... into entering on concent [sic] a very limiting visitation order and a[sic] order of protection. *Id.* at pp. 6–7.

Looking at the Complaint, Bibeau's first cause of action states that Defendants conspired to violate his constitutional rights to equal protection, procedural due process, and due process. *Id.* at p. 2. His second cause of action appears to be a further recitation of the alleged facts. *Id.* at p. 3. His Third cause of action alleges slander, selective discrimination against him, deliberate indifference to his constitutional rights, and an Eighth Amendment violation. *Id.* at p. 5. However, in his Memorandum of Law, he states that his first cause of action is a conspiracy under 42 USC § 1986, the Second cause of action is the failure to act under the Eighth Amendment of the United States Constitution, and the Third is a denial of substantive due process and equal protection as found in the Fourteenth Amendment of the United States Constitution. Pl.'s Mem. of Law at p. 5.

## II ANALYSIS

### A. Motion to Dismiss Standard

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (emphasis added). On a motion to dismiss, the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. *See id.; see also Wheeldin v. Wheeler,* 373 U.S. 647, 648, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963) (inferring facts from allegations of complaint). A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).[3] The Court of Appeals for the Second Circuit has interpreted the foregoing language as requiring that lower courts apply "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible* [,]" but does not require a heightened

pleading standard for civil rights claims. *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (emphasis in original). Thus, In spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

**\*4** Thus, the complaint must allege sufficient facts that would make the pleaded legal theories plausible. *See Twombly v. Bell Atl. Corp.,* 425 F.3d 99, 111 (2d Cir.2005); *Todd v. Exxon Corp.,* 275 F.3d 191, 200 (2d Cir.2001). Dismissal is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Phillip v. Univ. of Rochester,* 316 F.3d 291, 293 (2d Cir.2003) (citation omitted), or where the complaint fails as a matter of law. *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002).

### B. Statute of Limitations

The first issue that the Defendants raise in their Motion to Dismiss is the statute of limitations. In their view, all of the pleaded claims are untimely. It is seminal law that a § 1983 action has a three year statute of limitations. *Owens v. Okure,* 488 U.S. 235, 250–51, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) (cited by *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994); *Abbas v. Dixon,* 480 F.3d 636, 638 (2d Cir.2007); *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997); *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995). Although the statutory period is determined by state law, federal law determines the accrual of a § 1983 action. As a general proposition, a § 1983 action accrues when a plaintiff knows or has reason to know of the injury which is the basis of the action. *Ormiston v. Nelson,* 117 F.3d at 71. More comprehensively stated, "the proper focus is on the time of the *discriminatory act,* not the point at which the *consequences* of the act becomes painful." That is, "the crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Eagleston v. Guido,* 41 F.3d at 871 (2d Cir.1994) (quoting *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) & *Singleton v. City of New York,* 632 F.2d 185 (2d Cir.), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981)). The burden of establishing a statute of limitations rests with the defendant,

*Kulzer v. Pittsburgh–Corning Corp.,* 942 F.2d 122, 125 (2d Cir.1991), *cert. denied sub nom Kulzer v. Owens–Corning Fiberglass Corp.,* 503 U.S. 939, 112 S.Ct. 1482, 117 L.Ed.2d 624 (1992), and the burden of arguing equitable tolling of the statute of limitation resides with the plaintiff, *Walker v. Artuz,* 2002 WL 34243994, at *2 (2d Cir.2002) (citing *Hizbullahankhamon v. Walker,* 255 F.3d 65, 75 (2d Cir.2001)).

The Complaint was filed on June 25, 2008. The issue for us is when Bibeau's constitutional claims accrued. The parties disagree as that question. Defendants argue that the matter accrued either when Dr. Soden spoke with Bibeau–Moscho on January 10, 2005, or on January 26, 2005, when Bibeau–Moscho's lawyer, Claudia Russell, sent a letter to Bibeau's attorney, Daniel Murray. Def.'s Mem. of Law at p. 2. On that date, Attorney Russell wrote that

> the report of Dr. Laura Soden contained some extremely damaging and disturbing information concerning Marcel Bibeau, not least of which is that he chose to conceal drugs and/or drug paraphernalia in the bedroom of his daughter, [S.B.], during the brief period of her infancy when he resided in the same household with the child and her mother.

**\*5** Compl. at Ex. 10, Russel Lt., dated Jan. 26, 2005, at ¶ 4.

It is this information concerning concealing drugs in his daughter's bedroom that is purportedly included in the evaluation submitted to Family Court, which Bibeau claims to be false. On the other hand, Bibeau submits that the first time he knew of the evaluation and that his HIPPA rights were violated was on July 8, 2005, when he received a two-paged letter from ex-wife, Bibeau–Moschos. Compl. at p. B. She wrote, in part, that "[t]he psychologist that saw [S.B.] does know you. She treated you at Clinton County[ ] and she read your letters." Compl. at Ex. 9, Bibeau–Moschos' Lt., undated, at p. 2. It is the date that he received the letter that Bibeau contends his constitutional claims accrued. Pl.'s Mem. of Law at p. 11.

But, we must consider another material factor as to when this action may have accrued. Pursuant to the Family Court order, the evaluation was apparently shown only to the lawyers

in this custody/visitation case and then the attorneys either shared the evaluation with their respective clients or provided a digest of its contents. When Bibeau appeared in court on March 24, 2005, his attorney, in words and effect, summarized the contents of Dr. Soden's report as follows:

> Dr. Soden put some stuff in that report that pretty much destroyed any chance you had of seeing your daughter, my advise to you is to let me bargin [sic] with the respondent and try to get you some contact, Dr. Soden advises that you have no contact with her. We need to keep this evaluation out of a fact finding hearing or your [sic] going to get screwed royally.

Pl.'s Mem. of Law at p. 11. [4]

Afterwards, the parties conferred and entered into an agreement where Bibeau received "very limiting [sic] visitation order and a[sic] order of protection" was issued. Compl. at p. 7.

We may agree with Bibeau that he did not known or should not have known that he may have been harmed on January 10, 2005, but we do not concur with him that the accural date is July 8, 2005. Attorney Russell alerted him to the purported false information that was contained in the report on January 26, 2005, and his attorney confirmed, on March 24, 2005, that the contents of the evaluation were especially damaging to him and they "need[ed] to keep this evaluation out of a fact finding hearing." As to his § 1983 claims, Bibeau should have known or have been aware that he was suffering a wrong for which damages may be recovered, at the latest, on March 24, 2005. We reiterate that "the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act becomes painful." *Eagleston v. Guido,* 41 F.3d at 871.

If for some reason, although none are articulated in his Memorandum of Law, Bibeau were to argue that there should be an tolling of the statute of limitations, his efforts would fail. Bibeau has not made a showing nor do we find any extraordinary circumstances that would have prevented him from filing his complaint within three years after being apprised of the damaging, albeit alleged falsity within the evaluation by Bibeau Moschos's Attorney as well as his

Attorney, sharing with him the evaluation's highly negative overview. Both of these events occurred before March 25, 2005. *See Hizbullahankhamon v. Walker,* 255 F.3d at 75. Further, Bibeau does not provide an explanation for his delay in filing this suit until June 25, 2008. Hence, these alleged constitutional claims are untimely.

**\*6** As to any asserted intention tort causes of action, even giving Bibeau the benefit of the doubt, they are untimely as well. Under New York Law, intentional torts, especially slander, libel, a violation of privacy, and false words causing special damages, have a one year statute of limitations. N.Y.C.P.L.R. 215. Accordingly, his Complaint is untimely in all respects and we recommend that his Complaint be dismissed.

### C. Causes of Action

Even though we recommend that the Complaint be dismissed by virtue of the statute of limitations, we will considered, nonetheless, whether Bibeau has stated a cause of action.

Both the Defendants and the Court believed that Bibeau was asserting a private cause of action for violation of his HIPPA rights. If a HIPPA violation occurs, the statute does not provide a private cause of action to the individual but merely provides an enforcement mechanism for the Secretary of Health and Human Services. *Pierre v. County of Broome,* 2007 WL 625978, at \*9 (N.D.N.Y. Feb.23, 2007). Bibeau acknowledges that there is no private cause of action under HIPPA. Pl.'s Mem. of Law at p. 13.

Next, in responding to Defendants' contention that are no facts asserting that Dr. Basten was personally involved in any act against Bibeau, Bibeau withdraws his suit against Dr. Basten. *Id.* at p. 13. *But see Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (there must be proof of an individual defendant's personal involvement in order to assert a constitutional claim for damages). At this juncture all who remain in this action are Dr. Soden and Joette Holgado. We will now review whether Bibeau has pled cognizable claims against both or either of them.

The crux of Bibeau's lawsuit is that false information was submitted to the Family Court which caused him to compromise his petition for visitation. The crucible is then: does Bibeau have a constitutional right to be free from false accusation in a report? Even if we assume that Soden's report

was a total prevarication, or laced with false information, there is no general constitutional right to be free from being falsely accused.[5] *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). If there is no right to be free from false information and there is no private or constitutional right to have your medical information remain confidential, Bibeau is unable to state either a protective right or a substantive due process claim. We find no other facts to support a substantive due process claim or the deprivation of a liberty interest without due process. Therefore, we recommend that Bibeau's due process claim be dismissed.

Bibeau asserts that his right to equal protection was violated. The equal protection clause "is essentially a direction that all persons similarly situated should be treated alike." *Brady v. Town of Colchester,* 863 F.2d 205, 216 (2d Cir.1988) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). As a general rule, the equal protection clause protects suspect classes and fundamental rights against inequitable treatment. *LeClair v. Saunders,* 627 F.2d 606, 611 (2d Cir.1980) (citing *Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (equal protection clause is primarily concerned with classes and groups). To establish selective prosecution, a plaintiff must show that he, compared with others similarly situated, was selectively treated and that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious intent to injure him. *Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005).

**\*7** Here, Bibeau has failed to articulate how he was discriminated in such a way that he was subject to inequitable treatment and his fundamental rights were violated. Making a false statement about the plaintiff does not constitute an equal protection claim. He has failed to show, compared with others similarly situated, that he was unconstitutionally selected to be harmed or injured.

Therefore, we recommend that this cause of action be dismissed.

Moreover, there is no Eighth Amendment violation adequately pled in this case. The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (cited in *Trammell v. Keane, et al.,* 338 F.3d 155, 161 (2d Cir.2003)).

To prove a violation of the Eighth Amendment, the Second Circuit stated that an inmate must show,

> (1) that the deprivation alleged is 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain.'

*Trammell v. Keane,* 338 F.3d at 161 (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Ingraham v. Wright,* 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (cited in *Trammell,* 338 F.3d at 162). Punishments prohibited by the Eighth Amendment include those that are "grossly disproportionate" to the severity of the crime including unnecessary and wanton inflictions of pain which are "totally without penological justification." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (citations omitted); *see also Hope v. Pelzer,* 536 U.S. 730, 737, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Hence, we recommend that this cause of action be dismissed.

We are somewhat confused if a conspiracy claim exists. If it does exist, it would have to involve Soden and Holgado, the only named and remaining Defendants. Yet, Bibeau states that he "withdraws all charges of conspiracy." Pl.'s Mem. of Law at p. 13. But prior to that, Bibeau proposes that his conspiracy claim is premised upon 42 U.S.C. § 1986, which, states in part, that

> [e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented[.]

If the conspiracy claims are not withdrawn and Bibeau is relying upon § 1986, his claim will fail. He did not plead a § 1986 cause of action in his Complaint. Such a claim can only be found in his Memorandum of Law and it is improper to plead new facts and new causes of action in opposition to a dispositive motion. *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 406 (S.D.N.Y.2006) (noting that courts have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment) (citations omitted). Here, at least in terms of a § 1986 claim, the Complaint fails to identify those persons who had knowledge that there were wrongs being conspired to be done against Bibeau and then failed to prevent or aid in preventing the commission of those wrongful acts.

**\*8** Assuming that the conspiracy counts have not been withdrawn, we will discuss whether Bibeau adequately pled a conspiracy cause of action under either §§ 1983 or 1985. A § 1985 cause of action is succinctly mentioned in the Complaint. Compl., at p. 5. But, if Bibeau did not withdraw his conspiracy claim, it would have to be dismissed as well for failure to state a cause of action. To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *Traggis v. St. Barbara's Greek Orthodox Church,* 851 F.2d 584, 586–587 (2d Cir.1988) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)). These elements are not much different from a § 1983 conspiracy cause of action and we are compelled to discuss a § 1983 conspiracy because of ambiguities created by Bibeau's vacillating position on whether there is such a claim.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted); *Taylor v. Hansen,* 731 F.Supp. 72, 78 (N.D.N.Y.1990). Complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed. "Diffuse and expansive allegations are insufficient, unless amplified by

specific instances of misconduct." *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) (quoting *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977)).

First, if there is no underlying constitutional violation, there can be neither a §§ 1983 or 1985 cause of action for conspiracy. *Pangburn v. Culberston,* 200 F.3d at 72 ( [A] conspiracy requires, *inter alia,* an agreement ... to act in concert to inflict an **unconstitutional** injury."); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) for the proposition that a conspiracy lawsuit "will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right") (emphasis added). Here, we have not found a constitutional violation stated within the Complaint. Nor have we found an equal protection violation or infringement of any privileges or immunities. Therefore, a conspiracy cause of action cannot stand. Moreover, Bibeau speaks of a conspiracy very generally but has not pled any facts that establishes that there was an agreement between Holgado and Soden, what the agreement may have been, that they acted in concert to injure him, and the overt act in furtherance of the conspiracy. If anyone did set out to injure Bibeau, the only person identified is Solden, and she alone cannot constitute a conspiracy. Accordingly, we recommend that this cause of action be dismissed.

## III. CONCLUSION

**\*9** For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss, Dkt. No. 14, be **GRANTED; and** it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

## All Citations

Not Reported in F.Supp.2d, 2009 WL 701918

## Footnotes

1   The Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3, referred this Motion to this Court for a Report–Recommendation. Dkt. No. 19.

2   Bibeau generally pleads his lawsuit in brief paragraphs but he failed to number those paragraphs as required by FED. R. CIV. P. 8. Nonetheless, because of the orderly manner in which Bibeau states his claims, both the Defendants and the Court are able to follow Bibeau's statement of facts and list of causes of action. Therefore, it is not incumbent upon us to denote these paragraphs with numbers, and references to the pages should suffice.

3   By its opinion in *Bell Atlantic,* the Supreme Court recently abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968, 167 L.Ed.2d 929 (2007) (quoting *Conley,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 1969.

4   We realize that this information is neither in the Complaint nor in a sworn affidavit, but it is revealing and may be decisive in terms of when his constitutional action may have accrued.

5   There may have been a common law cause of action but, as we noted above, those claims are time barred.

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.